GEORGE R. HOLSWADE, M.D., P.C. AND GEORGE R. HOLSWADE AND FERN HOLSWADE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1568–79.     Filed April 26, 1984.

*Emanuel Fishman,* for the petitioners.
*Scott D. Anderson,* for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal corporate income tax against the corporate petitioner for its taxable years ending October 31, 1974, and October 31, 1975, in the amounts of $269 and $625, respectively. Respondent also determined deficiencies in Federal individual income tax against the individual petitioners for 1974 and 1975, in the amounts of $951 and $1,663, respectively. After concessions by both sides, the issue for decision is whether the corporate petitioner may deduct, under section 162,[1] certain expenses in connection with the individual petitioners' Caribbean cruise, their Scandinavian cruise, and their stay at Acapulco, Mexico.

---

[1]Unless indicated otherwise, all section and subtitle references are to sections and subtitles of the Internal Revenue Code of 1954 as in effect for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and stipulated exhibits are incorporated herein by this reference.

When the petition in the instant case was filed, the corporate petitioner, George R. Holswade, M.D., P.C. (hereinafter sometimes referred to as the corporation), had its principal place of business in New York, N.Y., and the individual petitioners, George R. Holswade (hereinafter sometimes referred to as George) and Fern Holswade (hereinafter sometimes referred to as Fern), resided in Alpine, N.J.

### General

During the years in issue, George was a medical doctor, specializing in thoracic and cardiovascular surgery. His practice consisted mostly of implanting cardiac pacemakers. The nature of George's medical practice was such that both he and his patients were concerned with the mental and physical effects of the patient's sexual functioning and the possible impairment of that functioning, as it relates to the surgical procedures, postoperative care, and counseling performed by George.

George was a busy doctor. During 1974 and 1975, George saw about 300 patients each year and performed surgical procedures on about 200 of those patients each year. Of those surgical procedures, about 100 involved initial pacemaker implants and between 50 and 75 involved changing pacemakers.

George was licensed to practice medicine in New York, New Jersey, Massachusetts, and California. During the years in issue, continuing medical education was not required by any of the States in which George was licensed. The American Medical Association (hereinafter sometimes referred to as the AMA), however, had an optional continuing medical education program. Under this program, it classified education courses into two categories—category 1 and category 2. The continuing medical education in category 1 is considered to be of higher quality than that in category 2.

During the years in issue, George attended a meeting of the American College of Surgeons, which constituted a week-long continuing medical education program, and the annual meet-

ings of the American Association for Thoracic Surgery and the Society of Thoracic Surgeons.

George conducted his practice at a hospital until some time in 1967, when he moved his medical practice to a private office.

On November 16, 1972, the corporation was organized as a professional corporation. Its sole business activity was the practice of medicine. George was the sole shareholder of the corporation. George and Fern were officers of the corporation, George being its president and Fern being its secretary. During the years in issue in the instant case, the corporation had two employees—George and a receptionist-secretary; Fern did not get paid for her work as the corporate secretary.

For the years in issue, the corporation's taxable year began on November 1 and ended on October 31.

The corporation made contributions to the George R. Holswade, M.D., P.C. Retirement Trust (hereinafter, sometimes referred to as the trust), under an employee profit-sharing plan and an employee pension plan. George and Fern were the only trustees of the trust. During the corporation's taxable years 1974 and 1975, its contributions to the trust amounted to $28,236 and $28,742, respectively. Investment decisions for the trust were made by George and Fern, in consultation with an attorney and the broker involved in the transaction.

Between June and September in both 1974 and 1975, George and Fern vacationed for several long weekends in a house they had in or near the Pocono Mountains in Pennsylvania. George and Fern vacationed for 2 weeks during the summer of 1975 at Cape Cod, Mass.

### Caribbean Cruise

During the period from March 8 through March 16, 1974, George and Fern took a cruise aboard the SS *Queen Elizabeth II* (hereinafter sometimes referred to as the *QE II*). The *QE II* is equipped with facilities and activities usually associated with a luxury hotel, including movie theaters, bars and cocktail lounges, ballrooms, nightclub acts, casino gambling, shuffleboard, paddle tennis, table tennis, and a gymnasium.

Traveling by airplane, on March 8, 1974, George and Fern left New York, arrived at Bridgetown, Barbados, West Indies, that evening and boarded the *QE II*. The *QE II* sailed from

Bridgetown on March 8, 1974, and docked at New York, N.Y., on March 16, 1974. During this cruise, the *QE II* stopped at three ports in the Caribbean—Caracas, Curacao, and Nassau— and at Port Everglades, Fla. At the three ports in the Caribbean and at Port Everglades, George and Fern left the *QE II* for shopping and sightseeing. George and Fern stayed in Caracas about 7 or 8 hours, in Curacao and Nassau about 3 or 4 hours each, and in Port Everglades about 1 or 2 hours.

During the cruise, a seminar, entitled "Seminar at Sea," was conducted on board the *QE II*. This seminar was sponsored by the American Professional Practice Association (hereinafter sometimes referred to as APPA), and the National Association of Residents and Interns (hereinafter sometimes referred to as NARI). APPA and NARI are organizations interested in the business and economic aspects of a medical practice. George is a member of APPA. Most of those who attended the Seminar at Sea were physicians or dentists, and their spouses. The seminar lectures were scheduled for a total of 15½ hours. The scheduled dates, times, and topics of these lectures are shown in table 1.

TABLE 1

| *Date and time* | *Topic* |
| --- | --- |
| Saturday, Mar. 9, 1974 9 a.m. – 1 p.m. | AAFMG, ABA, APPA, NAP, NARI, PDE— |
| | Who we are – and What we are all about. Investment ABC's for Financial Security. Getting the most from your membership— Plans and Programs. Question and Answer Discussion Panel. |
| Tuesday, Mar. 12, 1974 9 a.m. – 1 p.m. | Stocks – Bonds – Mutual Funds: Stocks – Potentially good investments today. Bonds – Many types for many purposes. Mutual Funds – Are they passé – or should we give them another look? Are you prepared to be a Widow? a Widower? The Dangers of JOINT Ownership. Why buy Real Estate? When? Where? How? Question and Answer Discussion Panel. |
| Tuesday, Mar. 12, 1974 [1] 2:30 p.m. – 4:30 p.m. | Where Tax Shelters fit in prudent planning. Professional help in Money Management. |

### TABLE 1

| Date and time | Topic |
| --- | --- |
| | Who needs a Will? |
| | Question and Answer Discussion Panel. |
| Friday, Mar. 15, 1974 9:30 a.m. – 1 p.m. | National Health Insurance Legislation and how it will affect you. |
| | Is the Corporate Route still attractive? |
| | Retirement Plans – in light of recent and proposed legislation: |
| |     Expanded Keogh – for non incorporated. |
| |     Pension Limitations – for Professional corporations. |
| | Is Your Medical Reimbursement Plan all that it should be? |
| | Question and Answer Discussion Panel. |
| Friday, Mar. 15, 1974 2:30 p.m. – 4:30 p.m. | Ask the Experts – Your questions on PCs and Funding of Pension and Profit-Sharing Plans. (Panel Discussion) |

[1]This session was actually held on Wednesday, Mar. 13, 1974, for about 3½ hours in the morning.

The change in the Tuesday afternoon program resulted in the lectures lasting about 17 hours. George and Fern attended these lectures and took extensive notes.

George received at least one or two referrals from the people he met during the cruise. Drumming up business, however, was not George's objective in taking the cruise. The fact that the Seminar at Sea was given aboard the *QE II* affected George's decision to attend.

The registration fees for George and Fern for the Seminar at Sea totaled $110, or $55 each. The cost of the trip arrangements[2] for both George and Fern was $1,074.

The corporation paid $1,184 for the travel arrangements ($1,074) and registration fee ($110), and deducted this amount as travel expenses on its Federal corporate income tax return for its 1974 fiscal year.

George and Fern did not include any amount of the total cost of the Caribbean cruise ($1,184) as an item of income on their 1974 joint Federal individual income tax return.

---

[2]The trip arrangements consisted of: (1) Air fare for George and Fern from New York to Bridgetown; (2) accommodations and meals for George and Fern on board the QE II; (3) transportation costs and landing fees at Bridgetown and New York; and (4) a fuel surcharge.

On March 15, 1974, during the 3½-hour morning lecture and the 2-hour afternoon lecture (for a total of 5½ hours), matters relating to employee plans were discussed. The matters discussed in the other 11½ hours of lectures related primarily to the personal, financial planning of individuals, such as the physicians and their spouses who attended the lectures.

George and Fern intended the cruise to be primarily a vacation for them.

### Scandinavian Cruise

During the period from July 18 through August 1, 1975, George and Fern took a cruise aboard the SS *Stella Maris* (hereinafter sometimes referred to as the *Stella Maris*). The cruise was entitled the "Best of Scandinavia." The *Stella Maris* is smaller than the *QE II*; it is equipped with one small swimming pool and one small dance floor, but does not have movie theaters, nightclub acts, or gambling casinos.

Traveling by airplane, George and Fern left New York on July 17, 1975, arrived at Bergen, Norway, on July 18, 1975, and boarded the *Stella Maris* on July 18, 1975. The *Stella Maris* sailed from Bergen on July 18, 1975, and docked at Stockholm, Sweden, on July 31, 1975. On August 1, 1975, George and Fern traveled by airplane from Stockholm to New York. During this cruise, the *Stella Maris* was scheduled to sail to and stop at various North Sea and Baltic Sea ports, as shown in table 2.

TABLE 2

| 1975 | Port | Number of hours docked |
|------|------|------------------------|
| July 18 – 19 | Bergen | more than 24 |
| July 20 | Geiranger | 7½ |
| July 20 | Hellesylt | 1 |
| July 22 | Oslo | 8 |
| July 23 | Aarhus | 8 |
| July 24 – 25 | Copenhagen | 35 |
| July 26 | Visby | 7 |
| July 28 – 29 | Leningrad | 41 |
| July 30 | Helsinki | 6 |

Also, during the cruise, 16 optional sightseeing side trips, at or near the ports where the *Stella Maris* docked, were

available to George and Fern. George and Fern selected 11 of these sightseeing side trips at a cost of $720. They did not attend the sightseeing side trips to Leningrad and the Leningrad evening entertainment, for which they had made reservations. The full cost of these two sightseeing side trips ($108) (which they did not attend) was refunded.[3] George and Fern spent about 57 hours on the sightseeing side trips they attended. In addition, they spent some time on walking tours in Bergen and Copenhagen.

During the cruise, a medical workshop program entitled "Human Sexuality" (hereinafter sometimes referred to as the program) was conducted on board the *Stella Maris* by a corporation named Seminars and Symposia, Inc. The program was comprised of several workshops and designed for physicians with general and family practices, who increasingly are looked to as counselors and healers in sex education and the treatment of sexual malfunctions.

Originally, the workshops were scheduled to provide a minimum of 26 hours of classes. The dates and times when the workshops were actually conducted are shown in table 3.

### TABLE 3

| Date | Time |
|------|------|
| Friday, July 18 | 4:30 p.m.–5:30 p.m. |
| Saturday, July 19 | 4:00 p.m.–5:30 p.m. |
| Monday, July 21 | 2:00 p.m.–5:00 p.m. |
| Tuesday, July 22 | 8:00 a.m.–11:00 a.m. |
| Wednesday, July 23 | 8:00 a.m.–11:00 a.m. |
| Friday, July 25 | [1]9:00 a.m.–12:00 noon |
| Saturday, July 26 | 8:30 a.m.–11:30 a.m. |
| Sunday, July 27 | 8:00 a.m.–11:00 a.m. |
| Sunday, July 27 | 2:00 p.m.–5:00 p.m. |
| Thursday, July 31 | 8:00 a.m.–11:00 a.m. |
| Friday, August 1 | [1]9:00 a.m.–11:00 a.m. |

[1]These workshops included hospital visits.

George spent about 28 hours attending the workshops. Fern attended almost all the workshops.

_____

[3]This amount was refunded to the corporation (which had paid the amount of the costs of the side trips, *infra*) before Oct. 31, 1975, the end of its 1975 fiscal year. Thus, the net cost of the sightseeing side trips was $612.

The program qualified for a Physician's Recognition Award under category 2 of the AMA's classification scheme.

About 25 physicians attended the program. The areas of practice of these physicians included surgery, obstetrics, gynecology, internal medicine, and pediatrics. George was the only attendee whose area of practice was thoracic or cardiovascular surgery.

The registration fee for George to attend the program was $150.[4] The cost of the trip arrangements[5] for George was $1,598, and the final cost of the nine optional sightseeing side trips which George and Fern attended was $612 (see note 3 *supra*). Of the $612 cost of the side trips, one-half ($306) was attributable to the cost of the side trips for Fern.

The corporation paid $2,318 for the trip arrangements ($1,598) and side trips ($720), and deducted $2,210 (see note 3 *supra*) as travel expenses on its Federal corporate income tax return for its 1975 taxable year.

George and Fern did not include any amount of the total cost of the Scandinavian cruise and optional side trips ($2,210) as an item of income on their 1975 joint Federal individual income tax return.

All of the workshops which George and Fern attended were related to the business of the corporation.

George and Fern intended the cruise to be primarily a vacation for them.

## Acapulco Trip

During the period from December 4 through December 11, 1975, George and Fern stayed at the Condesa Del Mar Hotel (hereinafter sometimes referred to as the hotel) in Acapulco, Mexico. The hotel is a deluxe hotel with all the facilities usually found in a large, resort hotel.

Traveling by airplane, George and Fern left New York and arrived at Acapulco on December 4, 1975, and left Acapulco and returned to New York on December 11, 1975.

---

[4] The deductibility of this $150 by the corporation is not disputed by respondent.

[5] The trip arrangements consisted of: (1) Air fare for George from New York to Bergen, and from Stockholm to New York; (2) accommodations and meals for George aboard the *Stella Maris*; and (3) transportation and landing fees at Bergen and Stockholm.

During George's and Fern's stay at the hotel, they attended an economics seminar, sponsored by APPA and NARI, which was conducted at the hotel. The seminar lectures were scheduled to last about 16 hours. Thirteen lectures were grouped together and conducted during sessions which started in the mornings and lasted 4 hours. When four lectures were scheduled during the 4-hour session, each lecture lasted about 1 hour. When three lectures were scheduled during the 4-hour session, each lecture lasted about 1 hour and 20 minutes. When two lectures were scheduled during the 4-hour session, each lecture lasted about 2 hours. The scheduled lecture dates, topics, and speakers are shown in table 4.

### TABLE 4

| *Date and Time* | *Topics (Speakers)* |
| --- | --- |
| Friday, December 5, 1975<br>9:00 a.m. – 1:00 p.m. | 1. A Look Back and A Look Ahead at Pension Legislation for the Self-Employed (Honorable Eugene J. Keogh and Honorable George Smathers)<br>  – HR 10 and How It Came About<br>  – Employee Retirement Income Security Act of 1974<br>  – Prospects for More Pension Legislation<br><br>2. Coping With Today's Stock Market (Mr. Walter Probst, Registered Representative of Merrill, Lynch, Pierce, Fenner & Smith, New York City)<br>  – What Stocks We Like and Why<br>  Near Term Leaders<br>  Long Range Possibilities<br><br>3. Proper Management Can Make or Break your Practice and You (Mr. Ralph Biddle, President, Physicians Management Service Corp., New York City)<br>  – Most Common Errors & Solutions To These Problems<br>  – Helpful Tips on Getting the Most Out of Your Employees |

TABLE 4

*Date and Time*                                   *Topics (Speakers)*

4. Group Insurance Has Come of Age (Mr.
George J. Arden, APPA Executive Direc-
tor and President, Physicians Planning
Service Corp., New York City)

Monday, December 8, 1975       5. The Implications of the New Pension
8:00 a.m. – 12:00 noon              Reform Law (ERISA) (Mr. Marvin Ka-
mensky, Carlins & Kamensky, Chicago,
Illinois)
  – How It Affects Those Par-
    ticipating in Keogh Plans
  – How It Affects Those Who
    Are Incorporated
  – How It Affects the Deci-
    sion About Whether or
    Not to Incorporate

6. Investing Your Retirement Funds (Mr.
Walter Probst, Merrill, Lynch, Pierce,
Fenner & Smith, New York City)
  – What Does the Prudent
    Man Do?
  – What Investments Are
    Right For You?

Tuesday, December 9, 1975      7. Plan *Now* to Save on Your 1975 Federal
8:00 a.m. – 12:00 noon              Income Tax Return (Mr. Ralph Biddle,
President, Physicians Management Ser-
vice Corp.)
  – Line-by-line Review of
    Form 1040
  – Maximizing All Your De-
    ductions

8. Proper Estate Planning . . .
  . . . From The Lawyer's Point of View
    (Mr. Marvin Kamensky, Carlins &
    Kamensky)
  . . . From The Insurance Agent's Point
    of View (Mr. Thomas Capehart, Re-
    gional Vice President, Physicians
    Planning Service and Mr. Walter
    Schnee, Physicians Planning Ser-
    vice Corp., Pasadena, California)

TABLE 4

| Date and Time | Topics (Speakers) |
|---|---|
| | – The Need for Review<br>– "Horror" Stories About What Not to Do |
| | 9. Other Common Money Market Investment Vehicles (Mr. Walter Probst, Merrill, Lynch, Pierce, Fénner & Smith)<br>– Bonds, Treasury Notes, CD's, etc.<br>– The Effect of the New York City Financial Crisis on the Municipal Bond Market |
| Wednesday, December 10, 1975<br>8:00 a.m. – 12:00 noon | 10. Can Congress Save The Country From Going Collectivist?<br>(Honorable Eugene J. Keogh)<br>– How to Influence Your Congressman and Senator<br>– How to Persuade the Voters |
| | 11. Sophisticated Investing: Advantages and Pitfalls (Mr. Walter Probst, Merrill, Lynch, Pierce, Fenner & Smith)<br>– Commodities, Options, etc. |
| | 12. Collecting Collectibles<br>(Mr. George Arden, APPA Executive Director and President, Physicians Planning Service Corp.)<br>– Fine Art, Lithographs, Coins, etc.<br>– How to Get Started and Stay Interested |
| | 13. Recapitulation: Your Chance to Ask One Final Question of Our Panelists<br>(All Seminar Speakers) |

George and Fern attended these lectures and took extensive notes.

Individual consultations with Ralph Biddle could be scheduled during the afternoons of December 5, 8, and 10. A separate hourly fee was charged for these consultations. George did not schedule any such appointments.

George had never before been to Acapulco.

The registration fee for George to attend the economic seminar was $75 and the registration fee for Fern, as a spouse of a member of APPA, was $50. The cost of the trip arrangements[6] for George and Fern was $778.

The corporation paid $903 for the trip arrangements ($778) and registration fees ($125), during its 1975 taxable year,[7] and deducted this amount as travel expenses on its Federal corporate income tax return for its 1975 taxable year.

George and Fern did not include any amount of the total cost of the Acapulco seminar ($903) as an item of income on their 1975 joint Federal individual income tax return.

During lectures numbered 1, 2, 5, and 6 (table 4 *supra*), for a total of 6 hours, matters relating to employee plans were discussed. During lectures numbered 3 and 4 (table 4 *supra*), for a total of 2 hours, matters relating to the operation of the corporation's business were discussed. During the remaining 8 hours of lectures, matters relating primarily to the tax, estate, and financial planning of individuals were discussed.

George and Fern intended the trip to be primarily a vacation for them.

## OPINION

Respondent maintains that none of the expenses of the cruises and the Acapulco trip (except the seminar fee for the Scandinavian cruise, see note 4 *supra*) are deductible by the corporation under section 162(a).[8]

---

[6]The trip.arrangements consisted of: (1) Round trip air fare for George and Fern between New York and Acapulco; (2) accommodations and meals for George and Fern at the hotel; and (3) transportation costs and landing fees at Acapulco.

[7]The corporation paid this total in two payments of $325 and $578 on Aug. 27, 1975, and Oct. 6, 1975, respectively.

[8]Sec. 162(a) provides, in relevant part, as follows:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

*     *     *     *     *     *     *

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *

Petitioners contend that all the expenses for which the corporation claimed deductions are deductible.

We agree in large part with respondent.

As a preliminary matter, we take note of the limited nature of the controversy. Respondent disallowed the deductions to the corporation, and included the amounts as dividend income to the individual petitioners, because (respondent maintains) the expenditures were primarily for the benefit of the individuals. Petitioners' focus is on the ordinary and necessary relationship of the activities to the corporation's trade or business. The parties agree that (1) the individual petitioners are required to include in income the amounts of any of the disputed expenses that we hold to be not deductible by the corporation under section 162, and (2) the individual petitioners are not required to include in income the amounts of any of the disputed expenses that we hold to be deductible by the corporation under section 162.

Respondent does not contend that section 274 bars any of the claimed deductions. Petitioners do not claim that any of the disputed amounts are deductible by the corporation as additional compensation to George, and respondent does not maintain that these amounts would be unreasonable compensation. Also, petitioners do not contend that any of the amounts includable in the individual petitioners' income may be deducted by them as, for example, employee business expenses or section 212 investment expenses. See *Magill v. Commissioner*, 70 T.C. 465, 478–479 (1978), affd. without published opinion 651 F.2d 1233 (6th Cir. 1981).

We have chosen, in the instant case, to adhere to the parties' view of the parameters of the controversy. See *Estate of Fusz v. Commissioner*, 46 T.C. 214, 215 n. 2 (1966).

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 1.162–1(a), Income Tax Regs., provides the general rule that deductible business expenses "include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business". Thus, to satisfy the requirements of section 162(a), an expense must be ordinary and necessary and have the requisite relationship to the taxpayer's business.

## *A. Caribbean Cruise*

We have found, *supra*, that the corporation's sole business activity was the practice of medicine, and that, in carrying on this business, the corporation employed George and a receptionist-secretary. We have found also that the corporation made contributions under a profit-sharing plan and a pension plan on behalf of its two employees. These contributions were made to the trust of which George and Fern were the trustees.

Section 401(a) provides that a trust formed as part of a pension or profit-sharing plan by an employer for the exclusive benefit of the employer's employees or their beneficiaries "shall constitute a qualified trust"[9] if it meets a series of requirements. A qualified trust is, among other things, exempt from income taxes under subtitle A. Sec. 501(a).[10]

Contributions paid under a qualified plan are deductible only under section 404(a); they expressly are not deductible under sections 162 and 212. Sec. 404(a). However, as the regulations under section 404(a) recognize:

Any expenses incurred by the employer in connection with the plan, such as trustee's and actuary's fees, which are not provided for by contributions under the plan are deductible by the employer under section 162 (relating to trade or business expenses), or 212 (relating to expenses for production of income) to the extent that they are ordinary and necessary. [Sec. 1.404(a)–3(d), Income Tax Regs.]

Thus, to the extent that all or any part of the expenses in dispute were incurred by the corporation in connection with the pension plan or profit-sharing plan, or both, then these expenses may be deductible by the corporation. *Welch v. Helvering*, 290 U.S. 111 (1933); see, e.g., Rev. Rul. 68–533, 1968–2 C.B. 190.

We have found, *supra*, that matters relating to employee plans were discussed at the seminar on the Caribbean cruise

---

[9]Although the parties do not stipulate that the trust was a qualified trust under sec. 401(a), we note that respondent has not challenged the substantial deduction taken by the corporation for contributions to the trust, nor has respondent suggested any impediment to tax-qualified status. The parties' contentions appear to assume that the trust was a qualified trust. Accordingly, for purposes of the instant case, we treat the trust as a qualified trust under sec. 401(a) for the years in issue.

[10]The trust may nevertheless be subject to tax on its "unrelated business taxable income" (sec. 511 et seq.). Sec. 502(b).

during about 5½ hours of lectures, out of a total of 17 hours of lectures.

The wide range of proposals, discussions, and modifications which ultimately led to the enactment of the Employee Retirement Income Security Act[11] (hereinafter referred to as ERISA) on September 2, 1974, spanned several years.

The Seminar at Sea was held during March 8 through March 16, 1974, which was before enactment of ERISA. However, in 1973, (1) four different congressional committees held hearings on versions of the bill that became ERISA, (2) the Senate passed its version of the bill, and (3) many people expected that far-reaching legislation would be enacted. H.R. 2 (which was enacted as ERISA) was passed by the House of Representatives on February 28, 1974. The Senate amended H.R. 2 to conform to its 1973 bill and passed the amended H.R. 2 on March 4, 1974. Thus, just prior to petitioners' Caribbean cruise, substantial legislative action had been taken in the direction of the Federal laws relating to employee plans.

In light of the changes in the law then under active consideration by the Congress (especially with regard to employers' obligations as to qualified employee plans), we have no doubt that it would have been appropriate for every employer maintaining such a plan to take steps to understand what was happening and how it should act to meet its potential new obligations. In fact, many organizations conducted seminars, workshops, institutes, classes, and other proceedings in order to educate employers and others as to their likely obligations and options.

We conclude that the corporation's expenses with regard to those parts of the Caribbean cruise that concerned employee plans meet the statutory requirements that the expenses be both ordinary and necessary expenses of the corporation's trade or business. *Welch v. Helvering, supra.*

Both George and Fern were the only trustees of the trust and also the only officers of the corporation. We conclude that it was ordinary and necessary for the corporation to have both of them attend the seminar.

Respondent asserts that the corporation "was not in the business of making investments or in administering retire-

---

[11]Pub. L. 93–406, 88 Stat. 829.

ment plans during the years in question. These were activities performed by the [trust], a distinct and separate entity from the [corporation]." From this, respondent apparently concludes that expenses to enable George and Fern to learn "about the duties of a fiduciary, investments or retirement plans" were not "ordinary, necessary or directly or proximately related to the conduct of the [corporation's] business".

This position is wholly at variance with the real world concerns of any prudent employer (especially in light of conditions in 1974) and at variance with the clear implications of sec. 1.404(a)–3(d), Income Tax Regs.

Having agreed with petitioners that there was some business-related expense for the Caribbean cruise, we now consider the tax treatment of the expenses for this cruise as a whole.

Generally, travel expenses connected with the attendance by a professional at a convention or professional meeting are deductible. *Coughlin v. Commissioner*, 203 F.2d 307 (2d Cir. 1953); *Coffey v. Commissioner*, 21 B.T.A. 1242, 1244 (1931). When, as in the instant case, the trip combines both business and personal activities, then the entity claiming the deduction (in the instant case, the corporation) must prove that the trip was primarily related to its trade or business. Sec. 162(a). *Patterson v. Thomas*, 289 F.2d 108 (5th Cir. 1961); sec. 1.162–2(b)(1), Income Tax Regs.

*Hoover v. Commissioner*, 35 T.C. 566 (1961), is similar to the instant case. Hoover was a busy medical doctor. He discovered that Duke University School of Medicine was sponsoring a seminar to be held aboard a ship during a cruise. Hoover and his wife attended the cruise which lasted 18 days. During about 6 or 7 of these days, lectures were given; Hoover received a certificate indicating he had qualified for 25 hours of postgraduate education credit. The ship docked at such ports as Lisbon, Barcelona, Naples, and Palermo. At these ports, Hoover engaged in sightseeing. Hoover claimed a deduction for his costs of the trip. (35 T.C. at 566–568.)

This Court concluded that the cruise "was undertaken primarily for pleasure". (35 T.C. at 570.) The factors which influenced the Court included (1) the comparison between the length of the lectures (25 hours) and the length of the cruise

(18 days), (2) the features of the ship,[12] (3) the nature of the ports of call and Hoover's sightseeing activities while ashore, (4) the availability of similar coursework at much less cost and in settings more conducive to learning, and (5) the fact that Hoover was not required to study or prepare for the lectures.

As to the Caribbean cruise, we note the following: (1) The lectures totaled 17 hours, of which only 5½ hours related to the corporation's business. The cruise lated 8 days. (2) The ship, the *QE II*, was in effect a floating luxury hotel with (as we noted in *Hoover v. Commissioner*, 35 T.C. at 570), "all the features desired by those bent upon enjoying a vacation." (3) The ship stopped at tourist ports in the Caribbean and at Port Everglades, Fla., at each of which George and Fern went sightseeing. They spent about as much time sightseeing as they did attending the total seminar, or about 3 times as much time sightseeing as they did at those seminar sessions that related to the corporation's business. (4) The record does not indicate whether George and Fern were expected to, or did, study or prepare for the lectures, nor does it indicate whether equivalent programs were available at lesser cost and in settings more conducive to study rather than vacation.

We conclude that the Caribbean cruise, during which the Seminar at Sea was conducted, was primarily a personal vacation for George and Fern.

Nevertheless, the corporation is entitled to deduct those expenses of the cruise which are properly allocable to the corporation's trade or business. Sec. 1.162–2(b)(1), Income Tax Regs. The deductible expenses are those that relate to the 5½ hours of lectures as to employee plan matters.

Doing the best we can with an inadequate record, we hold that $100 of the corporation's Caribbean cruise expenses is deductible by the corporation and not includable in income by George and Fern; the remainder of the expenses is not deductible by the corporation and is includable in income by George and Fern. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); *Boser v. Commissioner*, 77 T.C. 1124, 1134 (1981), affd. by unreported order (9th Cir., Dec. 22, 1983); *Hoover v. Commis-*

[12]"That vessel was a passenger ship not specially equipped for the teaching of medicine. It possessed no wards, laboratories, lecture halls, and similar facilities. Instead, the vessel possessed bars, salons, and recreation facilities, i.e., all the features desired by those bent upon enjoying a vacation." *Hoover v. Commissioner*, 35 T.C. 566, 569–570 (1961).

*sioner*, 35 T.C. at 570–571; *Duncan v. Commissioner*, 30 T.C. 386, 390 (1958).

## B. Scandinavian Cruise

George spent about 28 hours attending the workshops on the Scandinavian cruise. There seems to be no dispute that these workshops related the corporation's business. Respondent does not dispute the corporation's deduction of the $150 fee to permit George to attend the workshops. The remaining dispute is as to the tax treatment of the corporation's payment of $1,598 for trip arrangements (see note 5 *supra*) for George on the Scandinavian cruise.

As to the Scandinavian cruise, we note the following: (1) The workshops lasted 28 hours, but the cruise lasted 14 days. (2) The ship stopped at nine ports in the North Sea – Baltic Sea area. The cruise was geared to vacationing, as is shown by availability of 16 optional sightseeing side trips. George and Fern went on 9 of these side trips, each of which required an additional payment, and for which the corporation paid (and deducted) a net of $612 in addition to the $1,598 trip arrangements cost. George and Fern spent twice as much time on these side trips as George spent on the workshops. These side trips were in addition to the walking tours George and Fern took in Bergen and Copenhagen. (3) The program qualified only as a category 2 program—the lesser quality category—on the AMA's optional continuing medical education program. (4) The record does not indicate whether George was expected to, or did, study or prepare for the workshops, nor does it indicate whether equivalent programs were available at lesser cost and in settings more conducive to study rather than vacation. (There is information that a course was available in St. Louis, Mo., and a program at Yale University, but no information as to comparability of content, cost, and convenience.)

We conclude that the Scandinavian cruise, during which the program was conducted, was primarily a personal vacation for George and Fern.

Nevertheless, the corporation is entitled to deduct those expenses on the cruise which are properly allocable to the corporation's trade or business. Sec. 1.162–2(b)(1), Income Tax Regs. The deductible expenses are those that relate to the 28 hours of workshops.

Doing the best we can with an inadequate record, we hold that $250 of the corporation's disputed Scandinavian cruise expenses is deductible by the corporation and not includable in income by George and Fern (this is in addition to the $150 registration fee, deduction of which has already been allowed by respondent, see note 4 *supra*); the remainder of the expenses is not deductible by the corporation and is includable in income by George and Fern. *Cohan v. Commissioner, supra; Boser v. Commissioner, supra; Hoover v. Commissioner, supra; Duncan v. Commissioner, supra.*

### *C. Acapulco Trip*

George and Fern spent 16 hours attending lectures on the Acapulco trip. Matters relating to employee plans were discussed at the seminar during about 6 hours of these lectures. By the time of the Acapulco trip, ERISA had been enacted, some of its provisions had taken effect, and others had delayed effective dates. For the reasons set forth in our discussion under *A. Caribbean Cruise, supra*, we conclude that the corporation's expenses, for George and Fern, with regard to those parts of the Acapulco trip that concerned employee plans are deductible by the corporation. For those same reasons, we reject respondent's contentions to the contrary.

In addition to the 6 hours of lectures on employee plan matters, George and Fern attended 2 hours of lectures on other matters relating to the operation of the corporation's business.

Having agreed with petitioners that there was some business-related expense for the Acapulco trip, we now consider the tax treatment of the expenses for this trip as a whole.

As to the Acapulco trip, we note the following: (1) The lectures totaled 16 hours, of which only 8 hours related to the corporation's business. The trip lasted 8 days. (2) George and Fern stayed at, and the seminar was conducted in, a deluxe hotel with all the facilities usually found in a large resort hotel. (3) Although individual consultations could have been scheduled for 3 of the 4 days on which lectures were conducted, neither George nor Fern scheduled any such consultations. As a result, all the afternoons were free for personal activities. (4) The record does not indicate whether George and Fern were expected to, or did, study or prepare for the lectures, nor does

it indicate whether equivalent programs were available at lesser cost and in settings more conducive to study rather than vacation.

We conclude that the Acapulco trip, in the course of which the seminar was conducted, was primarily a personal vacation for George and Fern.

Nevertheless, the corporation is entitled to deduct those expenses on the trip which are properly allocable to the corporation's trade or business. Sec. 1.162–2(b)(1), Income Tax Regs. The deductible expenses are those that relate to the 6 hours of lectures as to employee plan matters and 2 hours of lectures as to other matters relevant to the corporation's business.

Doing the best we can with an inadequate record, we conclude that $200 of the corporation's Acapulco trip expenses is deductible by the corporation and not includable in income by George and Fern; the remainder of the expenses is not deductible by the corporation and is includable in income by George and Fern. *Cohan v. Commissioner, supra; Boser v. Commissioner, supra; Hoover v. Commissioner, supra; Duncan v. Commissioner, supra.*

To reflect the foregoing and the parties' concessions,

*Decision will be entered under Rule 155.*