ROBERT HELSTOSKI AND MARGARET HELSTOSKI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Helstoski v. Comm'r
Docket No. 823-83 United States Tax Court
T.C. Memo 1990-382; 1990 Tax Ct. Memo LEXIS 400; 60 T.C.M. (CCH) 233; T.C.M. (RIA) 90382; July 24, 1990, Filed *400 Decision will be entered under Rule 155. Petitioner husband (H) owned 50 percent of three corporations and a partnership. The corporations built an apartment complex; they continued to own the apartment complex during the years in issue. The partnership, via H, managed the day-to-day affairs of the apartment complex. H hired and trained superintendents to help him with the needed maintenance. He was convicted of filing false tax returns. He served 9 months of an 18-month sentence, mostly in a prison in Florida. Petitioner wife (W) and their adolescent children visited him almost every weekend. One of petitioners' properties was damaged by a storm. Petitioners paid $ 20,000 in cash and $ 80,000 in nonrecourse notes for interests in two Robin Moore books, which were worth an aggregate of $ 13,500. HAA was a partnership formed to market certain lithographic prints. Petitioners made a partial payment for a partnership interest in HAA. Petitioners were not partners in HAA. Petitioners claimed a deduction for a distributive share of HAA partnership losses. Held: (1) Petitioners suffered a casualty loss; amount of loss determined. Sec. 165(c)(3), I.R.C. *401 1954. (2) Petitioners are not entitled to any deductions on account of their Robin Moore book tax shelters, notwithstanding IRS Policy Statement P-4-64. (3) Petitioners are not entitled to any deductions on account of their payment to HAA. Secs. 165(c)(3) and 165(e), I.R.C. 1954. (4) W's trips with their children to visit H in jail were primarily personal and not primarily for business. Expenses paid by the corporations allocable to those trips are dividend income to petitioners. Sec. 1.162-2(b), Income Tax Regs.
(5) Checks paid by the corporations to petitioners relating to snow removal and painting are not income to petitioners; other "repair and maintenance" checks are dividend income to petitioners. (6) The corporations' disallowed deductions for payments of insurance premiums on a duplex (half of which was petitioners' residence) are dividend income to petitioners. (7) The amount of the corporations' payment of a recognizance bond relating to H's false tax return trial is income to petitioners' burden of proof. (8) Petitioners did not underreport income from a laundry room concession in the apartment complex. *402 (9) Amounts of petitioners' interest payments on a mortgage determined, equalling respondent's post-trial concessions; burden of proof. (10) Liability determined for additions to tax under sec. 6653(a), I.R.C. 1954, for each year in issue. (11) The parts of the deficiencies attributable to the tax shelters (books and lithographic prints) are substantial underpayments attributable to tax motivated transactions. Sec. 6621(c), I.R.C. 1954 and 1986. Sanford Amdur, for the petitioners. William S. Garofalo and Daniel K. O'Brien, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in Federal individual income tax [1] and additions to tax under section 6653(a)[2] (negligence, etc.) against petitioners as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)
1976
$ 95,397
$ 4,770
1977 69,916
3,496
1978 60,102
3,005
1979 43,191
2,160
*406 By amendment to answer, respondent asserts that petitioners are liable for an increased rate of interest under section 6621(c), [3] on account of substantial underpayments attributable to tax motivated *407 transactions for 1978 and 1979. The underpayments to which the increased interest would apply are those resulting from the adjustments dealt with in issues (II) and (III) (relating to "literary works" tax shelters and a lithography tax shelter). Also by amendment to answer, respondent asserts that petitioners underreported income for 1976, 1977, 1978, and 1979 from a laundry room concession and claims that this results in increased deficiencies of $ 4,200 for each of the years in issue. [4] After concessions by both sides, the issues for decision are as follows: (1) Whether petitioners are entitled to a casualty loss deduction for 1976 on account of a storm and the loss of a pond and an access road on certain property; (2) Whether petitioners are entitled to deduct for 1978 and 1979 their cash investments in certain Robin Moore "literary works" tax shelters; (3) Whether petitioners are entitled to deduct for 1979 their cash investment in a lithography tax shelter; (4) Whether petitioners must include in their gross income for 1977 and 1978 amounts paid in those years by petitioner husband's 50-percent-owned corporations so that petitioner wife and petitioners' children could *408 visit petitioner husband in prison; (5) Whether petitioners must include in their gross income for 1976 through 1979 amounts paid by petitioner husband's 50-percent-owned corporations to petitioners, allegedly as reimbursement for amounts which petitioners had spent on repairs and maintenance on behalf of the corporations; (6) Whether petitioners must include in their gross income for 1977 through 1979 amounts paid by one of petitioner husband's 50-percent-owned corporations for insurance on a duplex, half of which was used as a business office, and the other half of which was petitioners' residence; (7) Whether petitioners must include in their gross income for 1977 an amount paid by one of petitioner husband's 50-percent-owned corporations for the posting of a recognizance bond in connection with petitioner husband's imprisonment for filing false tax returns; (8) Whether petitioners had unreported income from the operation of a laundry room concession in 1976 through 1979 and, if so, in what amounts; (9) Whether petitioners are entitled to deduct, for 1976 through 1979, as interest paid to a bank, amounts in excess of those conceded by respondent on brief; (10) Whether *409 petitioners are liable for an addition to tax under section 6653(a) for 1976 through 1979; and (11) Whether petitioners' tax shelter deductions for 1978 and 1979 generated substantial underpayments of tax attributable to a tax motivated transaction within the meaning of section 6621(c). *410 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Robert Helstoski and Margaret Helstoski (hereinafter sometimes referred to as "Robert" and "Margaret", respectively), husband and wife, resided in Saddle River, New Jersey. Arnold Freilich (hereinafter sometimes referred to as "Freilich") was petitioners' accountant and prepared petitioners' income tax returns for the years in issue. Robert was born on July 1, 1930. He completed 3 years of college. He is a builder, contractor, and developer by occupation. Rutherford Park, Inc., Rutherford Heights, Inc., and Rutherford East, Inc. (hereinafter sometimes collectively referred to as "the Corporations") are New Jersey corporations. The Corporations were formed in the 1960's for the purpose of constructing and operating a garden apartment complex of about 250 units (hereinafter sometimes referred to as "the Apartments") in East Rutherford, New Jersey. During the years in issue, the Corporations owned the Apartments. The Corporations operated the Apartments through a partnership, *411 Rutherford Management Co. (hereinafter sometimes referred to as "Management"). Each of the Corporations used a taxable year ending on March 31 and reported its income on the cash basis. Three corporations were formed rather than just one because (1) Robert and the other investors estimated that it would cost $ 2,400,000 to build the Apartments, and (2) the mortgage companies did not want to lend more than $ 1,000,000 to any one corporation. The original investors in the Corporations were Robert, Frank Racioppi (hereinafter sometimes referred to as "Racioppi"), Michael Sadin (hereinafter sometimes referred to as "Sadin"), and Harry and Joseph Wilf (hereinafter sometimes referred to as "the Wilfs"). Robert has been president and 50-percent shareholder of the Corporations since the dates of incorporation; Racioppi and Sadin were secretary and treasurer, respectively. Initially, Racioppi and Sadin each owned 15 percent of the Corporations and the Wilfs each owned 10 percent. The Wilfs disposed of their interests in the Corporations in the mid-1970's, and Racioppi and Sadin each became 25-percent shareholders. Sadin died on or about April 15, 1981. Robert was the general contractor *412 for the construction of the Apartments, the subcontractor for the needed concrete work, and the purchaser of most of the materials used by the other subcontractors. Racioppi and Sadin were in the lumber business, and obtained inexpensive lumber for the Corporations. The Apartments were 16 two-story garden apartment buildings with no common halls. The Corporations' principal place of business was in one-half of a building at 19 Grant Street (hereinafter sometimes referred to as "19 Grant Street") in East Rutherford, New Jersey. Petitioners lived in the other half of 19 Grant Street. The 19 Grant Street duplex was located within four blocks of the Apartments. Management is a partnership which was formed in 1967 for the purpose of managing the day-to-day operations of the Apartments. The partners in Management and their respective partnership interests were Robert (50 percent), Racioppi (25 percent), and Sadin (25 percent). Management maintained its office in 19 Grant Street. Margaret was an employee of the Corporations during the years in issue; she did the corporate bookkeeping, collected and deposited rents, and answered the telephones. Margaret has a B.S. degree in Education *413 and is a former elementary school teacher; however, she did not have any accounting background. Robert worked full-time for the Corporations during the years in issue, except when he was in prison (see 4. Travel Expenses -- 1977 and 1978, infra). Robert and Margaret received salaries from the Corporations during the years in issue. Both Julian Sadej and Maria Sadej (hereinafter sometimes referred to as "Julian" and "Maria", respectively) were employed by the Corporations; Julian was the Apartments' superintendent during most of the years in issue; Maria opened the laundry rooms and did odd jobs around the Apartments. In the summer of 1979, Alex Giedrys took over as superintendant. Julian hired local Polish immigrants as needed to do work for the Corporations. The Polish immigrants were not on the corporate payroll and had "limited" immigration status. 1. Casualty Loss (Dam) -- 1976
On April 19, 1976, petitioners bought about 25 acres of land in Saddle River, New Jersey, from Joseph and Marcia Beisler (hereinafter sometimes referred to as "the Beislers") for $ 400,000. Saddle River is about a one-half hour auto trip from East Rutherford. A stream *414 known as Saddle Brook, a tributary of the Saddle River, flows through the property that petitioners bought from the Beislers (hereinafter sometimes referred to as "the Saddle Brook property"). The Beislers had a concrete dam built on the stream around 1968 at a cost of somewhat more than $ 7,000. The dam resulted in a pond on the upstream side of the dam. The pond was somewhat triangular in shape, covering an area of about 6,500 square feet or about .15 of an acre, and about 8 feet deep in the center. The dam is at about the center of the Saddle Brook property. There was an access road on one side of the pond. The dam is about 60 feet across; the footings were about 1 to 2 feet deep. In the center of the top of the dam, there is a cut-out, or indentation, which is 6 inches lower than the rest of the dam. The Beislers also had a roadway built near the dam, and installed a culvert over part of the stream. Around 1975, the Beislers added wing-walls to the dam to keep water from running around the dam. During the period when the Beislers owned the Saddle Brook property, and after they had the dam built (1968-1976), water from Saddle Brook flowed over the indented part of the dam *415 except during periods of drought. While the Beislers owned the Saddle Brook property, there were occasional problems with the dam. In the spring or after a heavy rain, water would flow over the entire length of the dam, and not just over the indentation. Occasionally, the stream flowed around one or both ends of the dam and the soil washed away. On these occasions, the Beislers had the pond drained and the soil around the ends of the dam replaced. From time to time, storms washed away the roadway near the dam, but no one storm caused more than a few hundred dollars of damage. On June 30, 1976, violent thunderstorms hit northern New Jersey and southern New York. Some areas suffered substantial damage from lightning and flooding, while other areas were almost unaffected. The Saddle River overflowed its banks. In Paramus, New Jersey, the Saddle River overflowed its banks by 5 feet on both sides, although it caused little damage. Some witnesses said it was the heaviest downpour they had ever seen outside of a hurricane. In some areas, trees toppled and buildings were damaged. Over the years, the stream had gradually scoured away part of the soil under the dam's footings, but *416 the dam still held, and petitioners still had their pond. The storm damaged the Saddle Brook property; it did so by (1) undermining the dam's footings, which allowed the stream to pass under the dam, thereby draining petitioners' pond, and (2) washing away the access road to the pond. The storm damage to petitioners' Saddle Brook property decreased the fair market value of this property. In addition to his role in building the Apartments and other housing, Robert has some experience with concrete construction, engineering, and contracting, having worked as an estimator for a concrete engineering firm and as an hourly employee for a contractor building a 100-foot concrete dam in New York City. Robert did not effect any repairs to the dam. Table 1 summarizes the parties' positions and the Court's findings regarding petitioners' claimed casualty loss. Table 1
Loss
Petitioners' 1976 tax return
$  50,000
Petitioners' amended 1976 tax
100,000
return, dated "11/3/80"
Notice of deficiency
-0-
Petition
50,000
Respondent's expert
* 8,700
Petitioners' expert
80,000
Petitioners' opening brief
80,000
Petitioners' answering brief
90,000
Court's finding
12,000
*417 2. Book Shelters -- 1978 and 1979
By a purchase agreement dated July 15, 1978, Robin Moore [5] sold the exclusive rights to two books -- "Sex Spy for the I.R.S." (later renamed "Elsa: Operation Leprechaun"), by Robin Moore and Elsa Guitierrez, and "Super-Rex" by Robin Moore and John Devaney -- to Edward Gary Reisdorf (hereinafter sometimes referred to as "Reisdorf") and Stephen G. McCarthy (hereinafter sometimes referred to as "McCarthy"). Reisdorf was the promoter for various Robin Moore books. Robin Moore is the author of many books. *418 Petitioners gave to Reisdorf, as "Trustee", $ 20,000 in checks plus $ 80,000 in nonrecourse or contingent notes for an interest in the two Robin Moore books. The first check was for $ 10,000 and was dated December 29, 1978; the second check was for $ 10,000 and was dated April 2, 1979. The words "Book Shelter" are written in the bottom-left corner of the April 2, 1979, check. On July 15, 1978, the two Robin Moore books had an aggregate fair market value of $ 13,500. Petitioners did not know anything about the book investments, other than that they were "tax shelters". Petitioners did not make any investigation into the bona fides of the promoters, nor into the substance of the book investments. Before he invested in the book shelters, Robert did not know anything about the publishing industry nor about the publishers involved in the instant shelters and had not even heard of Robin Moore. Rather, petitioners invested in the shelters on the recommendation of his brother-in-law Raymond J. Curcio [6] (hereinafter sometimes referred to as "Curcio"), and relied solely on the promoters as to the details of the underlying transactions. Robert was particularly persuaded to invest *419 by the promoters' claim that the tax shelter was "registered with the IRS". Petitioners claimed Schedule C losses on their 1978 and 1979 tax returns on account of the Robin Moore book investments as follows: 1978
1979
Income
$    722 $    - 0 -  Depreciation
(   53,487)
(   46,513)
Net profit (loss)
($ 52,765)
($ 46,513)
On their Schedules C for 1978 and 1979, petitioners reported the following information: Main business activity: Sales Product: Literary Work Business name: Robert Helstoski Accounting method: Cash They also reported that Robert had acquired the property in "8/78" and had a basis in it of $ 100,000, and that the depreciation was computed on the income-forecast method. The 1978 deduction was based on a forecast that the two Robin Moore books would produce $ 1,350 income for petitioners during the books' useful lives. The 1979 deduction was based *420 on a revised forecast that the two Robin Moore books would not produce any income for petitioners (presumably, other than the $ 722 income they had reported for 1978). 3. Lithography Shelter -- 1979
Hadley Art Associates (hereinafter sometimes referred to as "Hadley") was a New Jersey limited partnership formed on June 29, 1979, for the stated purpose of buying and exploiting art plates created by seven different artists. McCarthy was one of the two general partners of Hadley. As organized, Hadley had 16 limited partnership interests of $ 30,000 each. The minimum subscription was a one-half partnership interest requiring a $ 7,500 cash payment at the time of subscription and an additional $ 7,500 payable on February 15, 1980. Petitioners invested in Hadley on Curcio's advice. Petitioners made the first $ 7,500 payment to Hadley by a check dated December 28, 1979. Petitioners did not make the second payment by February 15, 1980. In November 1980, Curcio sent two letters to McCarthy, on his own behalf and on petitioners' behalf, seeking specific information as assurances that Hadley was a "viable, profitable business". Curcio stated that he and Robert would make *421 their second limited partnership payments when they received and accepted the requested information. Petitioners never made the second required payment, and never received an interest in Hadley. Even though petitioners did not have a partnership interest in Hadley and did not receive a Form K-1 from Hadley, petitioners claimed a loss on the Schedule E of their 1979 tax return in the amount of $ 13,905 as their distributive share of losses from Hadley. On the Form 3468 (Computation of Investment Credit) attached to their 1979 tax return, petitioners also claimed that, through Hadley, they had an $ 82,625 basis in new section 38 property with a useful life of 7 years. Because their claimed itemized deductions exceeded their reported adjusted gross income, the "regular tax" limitation prevented petitioners from using the otherwise-available 10-percent investment credit for 1979. Petitioners' 1979 tax return was filed on or about October 15, 1980. 4. Travel Expenses -- 1977 and 1978
On April 8, 1976, Robert Helstoski was convicted in Federal District Court, Newark, New Jersey, of 22 counts of willfully filing false Federal income tax returns (sec. 7206(1)). Five of *422 these counts related to petitioners' tax returns for 1969 through 1973; the remaining 17 counts related to the Corporations' tax returns for their corresponding taxable years. Robert was imprisoned in the Eglin Air Force Base Correctional Facility (hereinafter sometimes referred to as "Eglin") in Florida from late June 1977, to March 3, 1978. [7] While he was in prison, Robert made two collect telephone calls each weekday to consult with Margaret regarding the management of the Apartments, and also for personal purposes. While Robert was in prison, Margaret, Racioppi, and Julian ran the business. *423 Eglin did not provide for conjugal visitation. During the period of Robert's imprisonment, Margaret was worried about Robert's morale. While Robert was in prison, Margaret visited him every weekend except one. Petitioners' two adolescent children, Robert Henry Helstoski, Jr., and Gayle Susan Helstoski (hereinafter sometimes collectively referred to as "the children"), accompanied Margaret on each visit. The children accompanied Margaret because the Helstoskis had always been a close-knit family, and petitioners felt that the children needed frequent contact with their father. During their visits to Eglin, Margaret and the children initially stayed at hotels or motels, and eventually in an apartment. The Corporations paid for their travel expenses and accommodations. The Corporations' books showed two of the apartment rental payments as being for "repair and maintenance". On her trips to Eglin, Margaret brought the corporate books and whatever checks required Robert's signature. The one occasion when Margaret failed to make her weekly visit was the weekend of Margaret's niece's wedding. For that weekend, Margaret arranged for Julian, Maria, and Robert's brother (Henry Helstoski) *424 to visit Robert so that Robert could see some friendly faces and so that Julian could see that Robert was still alive and well. Julian, Maria, and Robert did not discuss any business during the course of the visit. On August 30, 1977, Margaret submitted an affidavit to the United States district court in an effort to have Robert moved from Eglin to Allenwood, Pennsylvania, a facility relatively close to New Jersey. Following are excerpts from the affidavit, dated August 30, 1977: MARGARET HELSTOSKI, being duly sworn deposes and says: 1. I am the wife of Robert Helstoski. We have two children, Robert Jr., age 16, and Gayle age 13. 2. When my husband went to prison it soon became obvious to me that I had no choice but to visit him at least once a week with the children. The reasons for this are: (a) We have always been a very close family. My children are in their adolescence and they need contact with their father more so than at any other time in their lives. I am fearful of the influences that might operate on them if they cease regular contact with their father. (b) I was seriously concerned with my husbands' [sic] morale. He was devastated by his imprisonment *425 and I feel that there was a real possibility that he would suffer a dangerous depression. (c) I have personally, been trying to keep his business alive. This involves serving approximatly [sic] 250 apartments. I do my best, but there are an unending number of problems that I have to take up with him, and my practice is to accumulate and discuss them with him weekly. I consider that keeping the business alive for my husband is absolutely essential for his mental health, aside from the fact that it is the source of the family's economic existence. * * * 4. I really do not have a choice about this since I am determined to protect my children and prevent my husband from being utterly destroyed as a father and as a human being.
5. Of course, if my husband were in Allenwood the travel cost would for all practical purposes disappear and the physcal [sic] burden on the family be minimal.
* * * Margaret's trips with the children to visit Robert during his imprisonment at Eglin were primarily personal, and not primarily business-related.
5. Repair and Maintenance -- 1976 Through 1979
The Corporation paid to petitioners the amounts disputed in this case in this issue by checks *426 totalling $ 6,542.80 in 1976, $ 7,950 in 1977, and $ 3,383.50 in 1978, and by a journal entry in the amount of $ 1,300 in 1979, all of which were entered on the Corporations' books as repair and maintenance expenses.
As found supra, Julian was the superintendent of the Apartments during most of the years in issue. Robert brought him into the business and trained him. Before that, Julian was working making jelly doughnuts. Julian bought supplies on behalf of the Corporations. Initially, Julian was reimbursed for his outlays after accounting for the expenses. For a while, Julian gave Robert receipts for repair and maintenance expenses, but Robert had him stop. In Robert's words, "he was paper working me to death." Instead, Robert paid $ 350 biweekly to Julian to cover the expenses necessary for Julian to clean the Apartments. Robert did not keep adequate records of his expenses.
All six 1978 repair and maintenance checks (dated From Jan. 30, 1978, through Mar. 7, 1978) were to reimburse Margaret [8] for amounts she had spent on snow removal for the Apartments. The sidewalks and stairs needed to be shoveled by hand, so the Corporations hired help to remove that snow. In the winter of *427 1977-1978, there was unusually heavy snowfall for the region. The Borough of East Rutherford, where the Apartments were, had an ordiance which provided fines of as much as $ 10,000 if snow were not shoveled promptly.
One of the repair and maintenance checks, in the amount of $ 2,000 and dated June 28, 1976, was compensation *428 for some of the painting Robert did at the Apartments. Petitioners reported $ 42,000 in 1976 as income from a painting business, and the $ 2,000 check was part of that reported imcome.
6. Insurance -- 1977 through 1979
During the years in issue, petitioners maintained a residence in one-half of 19 Grant Street; the Corporation and Management used the other half. One of the Corporations paid for asualty and liability insurance on 19 Grant Street for that corporation's taxable years ending March 31 of 1977 , 1978, and 1979, in the amounts of $ 295, $ 295, and $ 301, respectively.
7. Recognizance Bond -- 1977
By check dated january 6, 1977, one of the Corporations paid $ 25,000 to John Harrison (hereinafter sometimes referred to as "Harrison"), Robert's attorney, for the posting of a recognizance bond (hereinafter referred to as "the Bond") in the Federal district court on behalf of Robert. The check was recorded on the Corporations' books as a loan to Robert. The Bond was posted in connection with Robert's convictions discussed supra (4. Travel Expenses -- 1977 and 1978).
8 Laundry Room Income -- 1976 Through 1979
There were 2 laundry rooms in the Apartments, with about 10 clothes *429 washing machines and 4 dryers in each laundry room, for the tenants' use. Robert owned the machines personally and ran the laundry concessions. During some of the years prior to the years in issue, Robert earned about $ 8,500 per year from the concession. However, a fire temporarily forced Robert to close one of the laundry rooms, and the level of crime at the Apartments, together with vandalism and youth drug use in the laundry rooms, made tenants afraid to use the laundry rooms. During the years in issue, one of the laundry rooms was closed. The machines in the open laundry room were often broken. Robert earned less money from the laundry concession year-by-year, and eventually, around the end of 1978, closed the laundry rooms as unsafe and unprofitable.
* * * Robert's net profit from his laundry concession was correctly reported on petitioners' Federal income tax returns in the following amounts:
1976
$ 2,000
1977
1,200 1978
600 Petitioners did not have and laundry concession income from the Apartments in 1979.
9. Interest Deductions -- 1976 Through 1979
Margaret had a mortgage, #950-0263-4, with Citizens First National Bank of New Jersey (hereinafter *430 sometimes referred to as "Citizens Bank"). In 1977, Margaret made 13 payments of $ 991.14 each to Citizens Bank; one in each of the first 11 months, and two in December. Of the 1977 payments, $ 7,535.98 was interest. During 1977, the principal balance on the mortgage was reduced from $ 71,984 to $ 66,635.16. From September through December 1979, Margaret made various payments to Citizens Bank. Of those payments, five were in the amount of $ 991.14 and bore a stamped "M" on the lower left-hand portion of the check. Of the $ 4,955.70 which Margaret paid on the mortgage to Citizens Bank in 1979, $ 2,739.85 was interest. On April 19, 1976, Margaret borrowed $ 50,000 evidenced by her promissory note of the same date, payable to Citizens Bank. The promissory note was payable on demand, and bore annual interest of 7 percent. [9] This note was paid on June 1, 1981. *431 * * * Petitioners were negligent, and their negligence resulted in an underpayment, for each of the years 1976 through 1979. OPINION I. Casualty Loss (Dam) -- 1976
Petitioners claim a casualty loss deduction for 1976 in the amount of $ 90,000 (see table 1, supra) for rainstorm damage to the Saddle Brook property. They contend that a storm breached their dam, allowing the pond's water to run out. Respondent agrees that the water has run out of petitioners' pond. Respondent argues that: (1) the failure of the dam was due to gradual erosion of the earth around the dam's footings, which occurred "over a period of years", and thus was not a casualty within the meaning of section 165(c)(3); (2) in the alternative, petitioners have not proven that their property suffered a decrease in market value immediately after the loss of the pond; and (3) in the alternative, petitioners' casualty loss deduction should not exceed the cost of restoring the dam to its condition immediately before the storm -- between $ 5,800 and $ 11,600. We agree with petitioners that they suffered a casualty and that the casualty decreased the value of the Saddle Brook property. We agree for *432 the most part with respondent's last alternative as to the amount of the casualty loss. Section 165[10] permits individuals to deduct nonbusiness casualty losses to the extent not compensated for by insurance or otherwise. The measure of such a loss has generally been said to be the difference between the fair market value of the property immediately before the casualty and its fair market value immediately thereafter, but not exceeding its adjusted basis. See Helvering v. Owens, 305 U.S. 468, 471 (1939); Lamphere v. Commissioner, 70 T.C. 391, 395 (1978); sec. 1.165-7(b)(1), Income Tax Regs. Respondent does not maintain that petitioners' casualty loss deduction is limited by their adjusted basis in the property in the instant case. (See sec. 1.165-7(b)(2)(ii), Income Tax Regs., under which the relevant basis is petitioners' basis in the entire Saddle Brook property, not merely the dam, pond, and road.) *433 Casualty
Petitioners owned land in Saddle River, New Jersey. The Saddle Brook, a tributary of the Saddle River, flows through this land. Around 1968, a dam was built across the Saddle Brook, creating a pond on the Saddle Brook property. On June 30, 1976, a violent storm hit the area. Before the storm, the pond was intact, and a road provided access to the dam. After the storm, the pond had disappeared and the access road had been washed out. We have found that the storm caused the pond to disappear and the access road to be washed out. A loss from that kind of damage by a storm constitutes a casualty loss, deductible under section 165(c)(3). See Lamphere v. Commissioner, supra.
Respondent's expert, Alfred R. Pagan (hereinafter sometimes referred to as "Pagan") attributed the dam's failure to the possibility that the dam did not conform to acceptable design standards (the dam's footings assertedly were not deep enough) and to erosion over time, which had developed a scour hole near the center of the dam near the bottom of the dam's footings. However, Pagan admitted that he was not certain why the dam failed, and that several factors were *434 probably involved. Before the storm, the dam worked well enough to maintain the pond; we believe the storm caused the dam to fail. Accordingly, we conclude and have found that the loss of the pond and the access road was a result of a casualty. Amount of Loss -- Methods
We next consider the amount of petitioners' loss. We have held that, generally, the amount of a loss is shown by competent appraisals of the fair market value of the property immediately before, and immediately after, the casualty. An alternate method is to determine the cost of repairing the property to its precasualty condition; however, we have held that the cost-of-repairs method is not available unless the repairs were made. Lamphere v. Commissioner, 70 T.C. at 396. In the instant case, respondent urges us to use the cost-of-repair method, even though the repairs were not made. Since we conclude that (1) petitioners suffered a loss due to a casualty, (2) the expert evidence as to the fair market value of the Saddle Brook property immediately after the June 30, 1976, storm is entitled to so little weight as to be almost useless in determining the amount of the loss, and (3) respondent *435 has offered credible evidence as to how much it would cost to repair the Saddle Brook property, we have determined that the estimated cost of repairs is, as respondent puts it on brief, "the only realistic measure of the loss sustained". We first consider the appraisal evidence and then the cost-of-repair evidence. Appraisal
Petitioners retained Harley W. Hesson (hereinafter sometimes referred to as "Hesson") as an expert witness to testify about the decrease in value. Hesson prepared a report on the value of the Saddle Brook property immediately after the storm. However, Hesson died about 3 years before the trial. Petitioners chose to retain Lawrence E. Palatnik (hereinafter sometimes referred to as "Palatnik") to adopt Hesson's expert report. Palatnik is a licenced real estate broker and has been employed as a full-time independent fee appraiser since 1968. Palatnik reviewed Hesson's report and, with some reservations, adopted it as his own. However, Palatnik did not formally appraise the Saddle Brook property and did not prepare, or supervise the preparation of, an appraisal report on it. Hesson's report valued the property as of September 1, 1976, at $ 320,000. *436 Palatnik testified that Hesson's report seemed reasonable and substantially correct. Because petitioners bought the property on April 19, 1976, for $ 400,000, Palatnik testified that the value of the property had diminished by $ 80,000 as a result of the flood. Although Palatnik for the most part adopted Hesson's report, it is clear from the record that Palatnik had not been personally involved in the appraisal, and was not sufficiently familiar with the property or with the facts behind Hesson's report. Palatnik checked Hesson's report against public records to make sure that the comparable properties had indeed been sold at the prices quoted in Hesson's report, but that was the extent of Palatnik's verification of Hesson's appraisal. On cross examination, Palatnik admitted that it is not reasonable for an appraiser to give an appraisal without viewing either the subject property or the comparable properties. Palatnik admitted that he does not normally make appraisals without visiting the comparable properties contained in the appraisal. Palatnik never visited the dam site. The closest Palatnik came to the dam site, he testified, was to the foot of what he described as a 900-foot *437 driveway entering the Saddle Brook property. As we have found, the dam site is at about the center of the 25-acre Saddle Brook property. Palatnik did not see the dam. Although Hesson's report valued the property based on the value of comparable properties in the area, Palatnik never visited the supposedly comparable properties, and was unable to provide much information on them on cross examination. He did not know whether the comparable properties had streams or ponds on them, or whether the neighborhoods where the comparable properties were located were more or less desirable than the neighborhood of the Saddle Brook property. Palatnik had no personal knowledge of the Saddle Brook property, nor of the comparable properties referred to in Hesson's report. Palatnik testified that Hesson's analysis seemed to be reasonable. Palatnik testified that, in the area of the Saddle Brook property, land with a pond is worth more than land without a pond. We accept Palatnik's testimony (and Hesson's appraisal) as persuasive evidence that the fair market value of the Saddle Brook property was less without the pond, than it had been with the pond. We do not accept Palatnik's testimony (or *438 Hesson's appraisal) as persuasive evidence of the amount of the drop in fair market value. Cost of Repair
We now consider what it would have cost to repair the Saddle Brook property after the storm. At trial, both sides presented testimony as to the cost of repairing the dam and the access road. Respondent presented the expert testimony of Pagan, a consultant in hydraulic engineering and hydrology since 1973, and author of more than 70 articles in those fields. From 1968 to 1973, Pagan served as Executive Director of the Concrete Pipe Association of New Jersey. He examined the dam and stream to determine what caused the dam to fail, and what it would cost to repair the dam. In his expert witness report, Pagan estimated the cost of repairing the dam at between $ 5,800 and $ 11,600, based on 1976 construction costs, with his "best estimate" being $ 8,700. At trial, Pagan listed the following as necessary to repair the dam: (a) 10 cubic yards of steel-reinforced concrete; (b) diversion of Saddle Brook and excavation at the dam site; (c) rebuilding the access road to the dam site, requiring about 1 week of labor; (d) engineering studies; and (e) ecological impact studies *439 for State approval. Pagan admitted that he was an expert in hydraulic engineering and hydrology rather than in construction. Robert has experience in construction, working with concrete and building dams. This leads us to accord some weight to Robert's testimony as to the nature of the damage to the dam and as to the cost of repairing the dam. Pagan testified that part of the cost of repairing the dam would be providing access to the dam for vehicles to carry the ingredients for about 20 tons of concrete to the dam site. Pagan's report stated that "The maximum distance from a hard-surfaced road (Mill Road) is only about 1,000'." Robert, who is more familiar with the property, testified that about 1 mile would be needed because the terrain makes straight-line access to the dam site impractical. Robert estimated the cost of rebuilding the access road to be $ 22,500. The shortest distance from the dam site to Mill Road, entirely on land owned by petitioners, is about 1,100 feet. Robert's estimate of a 1-mile road would require about eight or nine parallel segments that seem totally unnecessary for access and might well require demolition of so many trees as to substantially devalue *440 the Saddle Brook property and make the eastern half of the Saddle Brook property largely unsuitable for recreational or residential purposes. After examining topographical maps of the Saddle Brook property and taking into account Robert's testimony about the terrain, we conclude that a useful access road to the dam site would probably be about 1,500 feet long. We also consider it significant that although the access road washed out several times while Beisler owned the Saddle Brook property, it cost him only a few hundred dollars to repair the access road; this accords generally with Pagan's expert report. However, Pagan agreed at trial that repairing the access road would require at least 1 week of labor. The damage caused by the June 30, 1976, storm was apparently greater than what Beisler had experienced while owner of the Saddle Brook property. Pagan and Robert also agree that repairing the dam will require engineering studies and ecological impact studies. Pagan testified those studies would have cost, respectively, $ 1,500 and $ 1,000 in 1976. We accept Pagan's estimates on these items. Pagan testified that his estimates of total costs (the $ 5,800 - $ 11,600 range) *441 did not take into account the cost of engineering studies. Also, Pagan's expert witness report does not refer to engineering studies or ecological impact studies for State approval. With regard to the cost of excavation, Pagan acknowledged that some work would be needed to divert the stream and to excavate at the base of the dam. Petitioners have not provided us with any information from which to calculate the costs which would be involved. Although Pagan acknowledged that some vagueness in dam repair estimates is reasonable because one does not know how much work needs to be done until the area is cleared out, we note that it is petitioners who must bear the burden of proof as to the amount of the casualty loss. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Casualty Loss-Conclusion
Pagan concluded that the cost of repairing the dam and the access road would be between $ 5,800 and $ 11,600 based on 1976 construction costs. Robert testified that repairing the dam would cost about $ 90,000. He would not, however, favor us with a detailed breakdown of how he arrived at the $ 90,000 figure (or the $ 50,000 loss claimed on petitioners' tax return, *442 or the $ 100,000 amount claimed on petitioners' amended tax return), and we do not accept his conclusory figure. [11] The trial was held in two separate sessions about 8 weeks apart; Robert had ample opportunity to prepare his calculations before testifying on rebuttal. Robert's estimate of $ 90,000 was for the cost of restoring the dam to like-new condition and substantially improving the dam. The cost-of-repairs *443 method limits petitioners to the cost of repairing the dam to its prestorm condition. [12]Sec. 1.165-7(a)(2)(ii)(d), Income Tax Regs. Because of Robert's misconception as to what the casualty loss provisions allow, we are generally inclined to follow Pagan's testimony except in a few areas. Giving primary weight to Pagan's evidence, but taking into account the required engineering study and ecological study, as well as the longer road, we conclude that it would have cost $ 12,000 in 1976 *444 to restore the Saddle Brook property to its prestorm condition; petitioners' casualty loss is $ 12,000. Petitioners' allowable deduction is the amount of the casualty loss, less the "floor" of $ 100, applicable to 1976. (Sec. 165(c)(3).) We hold in part for petitioners and in part for respondent on this issue. II. Book Shelters -- 1978 and 1979
Petitioners maintain that they are entitled to deduct their cash $ 20,000 investment [13] in the Robin Moore book shelters. Petitioners' only argument on brief is that under IRS Policy Statement P-4-64 (hereinafter sometimes referred to as "the Policy Statement"), respondent should have offered to settle the book shelters issue, granting petitioners deductions to the extent of their cash investment. [14]
*445 Respondent argues that (1) the Policy Statement was not timely raised and should not be considered, (2) petitioners failed to introduce any evidence to meet their burden of proof, and (3) even if it were applicable in the instant case, the Policy Statement does not grant any rights to taxpayers (it merely describes a procedure that respondent uses to resolve certain tax shelters expeditiously). We agree with respondent. At the outset, we note that petitioners have raised this issue for the first time on brief. We generally will not consider arguments raised for the first time on brief and not appearing in the pleadings or tried by consent (Rule 41(b)(1)), when to do so prevents the opposing party from presenting evidence that it might have presented if the issue had been timely raised. E.g., Estate of Rosenberg v. Commissioner, 86 T.C. 980, 984 n. 1 (1986), affd. without published opinion 812 F.2d 1401 (CA4 1987); Markwardt v. Commissioner, 64 T.C. 989, 997-998 (1975); Molbreak v. Commissioner, 61 T.C. 382, 293 (1973), affd. 509 F.2d 616 (CA7 1975). In any event, petitioners' contentions on this issue *446 are wholly without merit. Firstly, deficiency proceedings before this Court are de novo and we generally will not look behind a notice of deficiency to examine respondent's motives or procedures leading to his determinations. Riland v. Commissioner, 79 T.C. 185, 200-202 (1982); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974). Secondly, petitioners' argument is based upon a strained reading of the Policy Statement. [15] The Policy Statement does not provide that an out-of-pocket expenses offer will be made to any category of taxpayers. Rather, the Policy Statement merely states that the Examination Division "will be allowed to offer out-of-pocket expenses as a deduction". The Policy Statement by its language does not grant any rights to taxpayers; it merely describes a procedure that respondent may undertake to resolve certain categories of tax shelter cases as quickly as possible. *447 Thirdly, there does not appear to be any evidence in the instant case that petitioners were denied a chance to settle this issue on a basis that was made available to others in the same shelter or in essentially similar shelters. Fourthly, there is no evidence that disparate treatment, if there was any, contributed to any discrimination such as that involved in International Business Machines Corp. v. United States, 170 Ct.Cl. 357, 343 F.2d 914 (1965), upon which petitioners rely. We hold for respondent on this issue. III. Lithography Shelter -- 1979
Petitioners maintain that the promoters of Hadley stole their $ 7,500, and that petitioners are entitled to a theft loss deduction under section 165(c)(3) for 1978 or 1979. [16] Respondent maintains that: (1) petitioners have failed to show any violation of State or Federal law; (2) petitioners have not introduced any evidence of when they became aware of the alleged theft; (3) petitioners have not introduced any evidence that they attempted to recover the $ 7,500 from the alleged thieves; and (4) petitioners have not shown that attempting to recover from the alleged thieves would not have been reasonable. *448 We agree with respondent. Section 165(c)(3) (see n. 10, supra) permits individuals to deduct unreimbursed theft losses that exceed $ 100. The effect of section 165(e)[17] is that the deduction is allowable for the year in which the taxpayer discovers the loss. Whether a theft occurs is determined under State law. Luman v. Commissioner, 79 T.C. 846, 860 (1982). *449 Petitioners have the burden of proving that the loss qualifies as a theft loss within the meaning of section 165(c)(3), and that the loss was discovered by them during one of the years in issue. Welch v. Helvering, supra; Rule 142(a). Petitioners' only payment to Hadley was by a check dated December 28, 1979. We are bewildered by petitioners' suggestion on brief that this might be the foundation for a 1978 deduction. Also, this leaves very little time for a theft to be discovered in 1979. Petitioners have not pointed to any evidence in the record, and we have not found any, which suggests that petitioners discovered the asserted theft in 1979. Indeed, on petitioners' 1979 tax return, filed on or about October 15, 1980, petitioners claimed that their $ 7,500 payment resulted *450 in their being entitled to a $ 13,905 distributive share of Hadley partnership losses plus a $ 82,625 basis in Hadley new section 38 property. Presumably, on or about October 15, 1980, petitioners still thought that they owned a partnership interest in Hadley. We conclude that, if there was a theft, petitioners had not discovered their loss by the end of 1979, the last year in issue in the instant case. For completeness, we note that petitioners' evidence is not enough to carry their burden of persuading us that there was a theft under State law in 1979, wholly apart from the question of when petitioners discovered their loss. We hold for respondent on this issue. IV. Travel Expenses -- 1977 and 1978
Respondent maintains that none of the travel expenses in issue ($ 17,013 for 1977 and $ 5,600 for 1978) is a proper business expense of the Corporations (sec. 162(a)(2)) [18] and, accordingly, the Corporations' payments of these expenses result in dividend income to petitioners. *451 Petitioners contend that all the travel expenses which the Corporations paid are proper business expenses of the Corporations and, accordingly, petitioners did not receive any dividend income from the Corporations' payments of the travel expenses. We agree with respondent. As a preliminary matter, we note the limited nature of the controversy. Respondent disallowed the deductions to the Corporations, and included the amounts as dividend income to the individual petitioners, because (respondent maintains) the expenditures were primarily for the benefit of the individuals. Petitioners focus on the ordinary and necessary relationship of the activities to the Corporations' trades or businesses. The Corporations' dockets have been settled (see n. 1, supra). Respondent no longer contends that the amounts paid by the Corporations on behalf of petitioners constitute unreasonable compensation. Also, petitioners do not contend that any of the amounts relating to travel expenses which are includable in their income may be deducted by them as, for example, employee business expenses or section 212 investment expenses. See Magill v. Commissioner, 70 T.C. 465, 478-479 (1978), *452 affd. without published opinion 651 F.2d 1233 (CA6 1981). Gross income is defined broadly to include "all income from whatever source derived." (Sec. 61(a).) As the Supreme Court has stated, "this language was used by Congress to exert in this field 'the full measure of its taxing power.' Helvering v. Clifford, 309 U.S. 331, 334; Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216, 223; Douglas v. Willcuts , 296 U.S. U.S. 1, 9; Irwin v. Gavit, 268 U.S. 161, 166." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955). Generally, payments by another on behalf of the taxpayer constitute the realization by the taxpayer of gross income of one sort or another -- e.g., a payment by a corporation on behalf of a shareholder is treated as dividend income to the shareholder. TennesseeSecurities, Inc. v. Commissioner, 674 F.2d 570 (CA6 1982), affg. a Memorandum Opinion of this Court. [19] See Huff v. Commissioner, 80 T.C. 804, 814 (1983). *453 Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 1.162-1(a), Income Tax Regs., provides the general rule that deductible business expenses "include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business". Thus, to satisfy the requirements of section 162(a), an expense must be ordinary and necessary and have the requisite relationship to the taxpayer's business. George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. 686, 698 (1984). Respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioners bear the burden of showing that these determinations are wrong. Welch v. Helvering, supra; Rule 142(a). We have found, supra, that the Corporations' business activity was the ownership of the Apartments and (through Management) the operation of the Apartments. In carrying on this business, the Corporations employed Robert, Margaret, Julian, and Maria, among others. The issue at hand *454 is whether Margaret's and the children's weekly visits to see Robert in prison in Florida were primarily in furtherance of the Corporations' business activities. On the record before us, we conclude that the weekly visits were primarily personal in nature. Our decision rests on the following factors: (1) Each week but one, Margaret and the children travelled to Eglin to meet with Robert. There is no evidence that the children conducted any of the Corporations' business. On the other hand, petitioners believed it was important for the children to have frequent contact with their father, and Margaret was concerned about Robert's morale. (2) On the one occasion Margaret was unable to make the trip, she arranged for Julian, Maria, and Robert's brother to visit Robert. They did not discuss business during that trip. (3) When Margaret sought to have Robert assigned to a relatively nearby prison, the primary thrust of her petition to the District Court was the importance of maintaining the family ties. (4) Margaret and Robert spoke by telephone twice a day during the week to conduct business. Evidently, they found it practical to conduct much of the Corporations' business by *455 telephone. We assume that the Corporations' work that Margaret and Robert conducted during the weekly trips to Eglin were "necessary" to the Corporations' business in that they were "appropriate and helpful". Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Welch v. Helvering, 290 U.S. at 113. We do not intend to suggest that we should, as a matter of course, second-guess taxpayers' business decisions or restrict taxpayers to deduction of only the least expensive method of conducting their businesses. Nevertheless, when the individuals involved are major owners and ranking officers of the business in question, and when the issue is whether the travel expenses were primarily the personal expenses of those controlling individuals or primarily business expenses, one factor that may bear upon that issue is whether there are less expensive alternatives that would have been practical ways to conduct the business activities without so much, or so costly, travel. Hoover v. Commissioner, 35 T.C. 566, 570 (1961). See George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. at 701-702. In the instant case, petitioners do *456 not contend that some part of the travel expenditures would be excludable from their income even if we were to conclude that the trips to Eglin were primarily personal. Accordingly, we do not attempt to make any allocation of the expenditures. Cf. George R. Holswade, M.D., P.C. v. Commissioner, 82 T.C. at 702, 704, 705, and cases there cited. Petitioners argue that the following supports their contention that the visits were primarily for business: (1) Margaret brought the company books with her on her weekly visits to Eglin; (2) while down at Eglin, Margaret worked with Robert to compile a rebate to 250 tenants pursuant to the New Jersey Homestead Rebate Act, and Robert approved the payment of bills; and (3) Robert's signature was required on all corporate checks. We do not doubt that some business was conducted. However, the record before us leads us to conclude that, on the whole, the visits were primarily personal in nature. We hold for respondent on this issue. [20]
*457 V. Repair and Maintenance -- 1976 Through 1979
Respondent's determinations in the notice of deficiency include adjustments by way of dividend income on account of payments by the Corporations to petitioners, which payments had been shown on the Corporations' books as repair and maintenance expenses. By stipulation and exhibit, the parties identify certain checks and one journal entry as remaining in dispute. Table 2 shows the amounts so determined and so identified. Table 2
Determined in
Identified in
Year
Notice of Deficiency
Stipulation and Exhibit
1976
$ 17,903.00
$ 6,542.80
1977 *
6,346.00
7,950.00
1978
5,398.00
3,383.50
1979
1,300.00
1,300.00
On answering brief, respondent concedes that one 1976 check for $ 2,000 (which had been included in the identified and disputed $ 6,542.80) had been reported as income by petitioners on their 1976 tax return and therefore *458 is not a dividend. Respondent argues that the Corporations' "repair and maintenance" checks to petitioners that remain in dispute were dividends. Respondent points to the lack of documentary substantiation, and attacks Robert's credibility as a witness. Petitioners argue that the amounts listed on the Corporations' books as repair and maintenance expenses were just that, and as such are not dividends to petitioners. We agree in part with petitioners and in part with respondent. Under section 301, a dividend distribution is includable in the shareholder's gross income; the fact that the distribution is not pro rata among the shareholders does not preclude such characterization and treatment. E.g., Garrison v. Commissioner, 52 T.C. 281, 286 (1969); Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 422 (1954), affd. 236 F.2d 159 (CA6 1956). On the other hand, if the Corporations paid the amounts in issue to petitioners as reimbursement for petitioners' payment of corporate repair and maintenance expenses, then these amounts would not be dividends. Robert testified about the snow removal needed in 1978, the snow removal procedures *459 at the Apartments, and the reasons that Margaret paid cash directly to some of the hired snow removal help. In addition, the checks relating to snow removal bore notations, which appear to be contemporaneous, specifying the purposes for the checks. Although Robert's testimony as to a number of other matters impressed us as vague, evasive, or exaggerated, his testimony on this matter is believable and not contradicted by any other evidence of record. We conclude, and have found, that all of the "repair and maintenance" checks in 1978 were to reimburse Margaret for snow removal expenses which she paid on behalf of the Corporations. Accordingly, we conclude that petitioners did not have any income from the 1978 "repair and maintenance" checks. If respondent had not made his belated concession with respect to the $ 2,000 "paint" check as income for 1976 (see text after table 2, supra), then we would have held for petitioners on that point, also. As to the remaining $ 4,542.80 in 1976, $ 7,950 in 1977, and $ 1,300 in 1979, Robert's testimony on these amounts was vague and unconvincing, and is insufficient to carry petitioners' burden of proving that those amounts were paid to *460 reimburse petitioners for their outlays on behalf of the Corporations. Petitioners submitted three invoices for repair and maintenance expenses paid for in cash. However, these invoices total only $ 98.19 and do not indicate who paid for the repairs, nor whether the amounts were related to the Apartments. The three invoices totalling $ 98.19 are vague, and are not adequate proof of the remaining disputed $ 13,792.80 that petitioners allege they paid in 1976, 1977, and 1979. In fact, the three invoices are too vague to prove that petitioners paid even the $ 98.19 on behalf of the Corporations. Thus, as to the remaining $ 13,792.80 (but see table 2 regarding 1977), we conclude that petitioners have failed to carry their burden of proof. Respondent contends on answering brief that petitioners deducted the snow removal expenses as employee business expenses on their 1976, 1977, or 1978 tax returns. The Forms 2106 attached to these tax returns conflict with respondent's contention as to the 1978 snow removal checks. For 1977, petitioners deducted $ 3,384 for snow removal and $ 375 for outside labor. However, all the six snow removal checks we have discussed in this issue are dated *461 from January 30, 1978, through March 7, 1978. Petitioners did not take any 1978 deductions for snow removal or outside labor. We hold in part for respondent and in part for petitioners on this issue. VI. Insurance -- 1977 Through 1979
The parties have stipulated that, of the insurance on 19 Grant Street, one of the Corporations is entitled to deduct half of the amounts it paid during its taxable years ending March 31, 1977, and 1978, and all of the amounts it paid during its taxable year ending March 31, 1979. (See n. 1, supra.) The parties' stipulation did not deal with petitioners' inclusion of the disallowed amounts into their income. Petitioners maintained a residence in 19 Grant Street. On brief, petitioners fail to argue the insurance issue; we treat this as, in effect, a concession by petitioners that they are to include as dividend income the insurance payments that are not deductible by the Corporations. See subparagraphs (4) and (5) of Rule 151(e); Foil v. Commissioner, 92 T.C. 376, 409 (1989), on appeal (CA5, May 30, 1989); Money v. Commissioner, 89 T.C. 46, 48 (1987). We hold for respondent on this issue. VII. *462 Recognizance Bond -- 1977
Petitioners argue that Robert's checking accounts do not show any $ 25,000 payment from Harrison to Robert, and that accordingly, the recognizance bond money was not a constructive dividend to Robert. They contend that, if Harrison applied the recognizance bond money to Robert's legal fees, then petitioners should have income but only to the extent of 5/22 of the money so applied. [21] Respondent argues that the bond was clearly for Robert's benefit, that petitioners have the burden of proving that the money was refunded to the Corporations, and that petitioners have failed to carry that burden. We agree with respondent. Generally, a payment by a corporation on behalf of a shareholder is treated as dividend income to the shareholder. TennesseeSecurities, Inc. v. Commissioner, 647 F.2d 570 (CA6 1982). *463 Petitioners acknowledge, and we have found, that the Corporations paid $ 25,000 to Harrison to post the bond for Robert. Petitioners did not present any evidence as to what happened to the $ 25,000 after that. Robert's testimony shows that he did not clearly remember the transaction. Presumably, once Robert went to prison, the bond was refunded. However, the $ 25,000 would have been refunded to Harrison, and our examination of the record has not revealed any evidence as to whether Harrison paid the $ 25,000 to Robert, repaid the money to the Corporations, or applied the money to Robert's legal bills (and, if the last, then for what legal matters). Petitioners have the burden of proof on this issue, Rule 142(a). They did not produce Harrison; they did not produce Harrison's records; they did not show us that the $ 25,000 was not used in a way that produced income to them in that amount. We conclude that petitioners have failed to carry their burden of proving that the $ 25,000 bond was not a constructive dividend to them. We hold for respondent on this issue. VIII. Laundry Room Income -- 1976 Through 1979
Respondent maintains that petitioners underreported their *464 income from the Apartments' laundry rooms for 1976, 1977, 1978, and 1979. Respondent asserts that petitioners had $ 6,000 of laundry room income in each of those years rather than the $ 2,000, $ 1,200, $ 600, and 0, respectively, that petitioners reported. [22] (See n. 4, supra.) *465 Petitioners contend that they did not underreport Robert's laundry income. We agree with petitioners. Respondent has the burden of proof on this issue because he raised it for the first time on amendment to answer. Givens v. Commissioner, 90 T.C. 1145, 1152-1153 (1988); Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981); Rule 142(a). Gross income includes gains derived from business. Sec. 61(a)(2). [23]
Robert's testimony about the declining fortunes of the laundry operation is believable. It was supported in significant part by the testimony of Julian and of Alex Giedrys, Julian's successor. Julian testified that only one of the two laundry rooms *466 was open during the years before the Court and that sometimes as few as two of the clothes washers (out of 10) were in working order and available for use by the tenants. Julian was not sure whether the last laundry room had been closed by the time he stopped working for the Corporations. Alex Giedrys testified that, by the time he came to work, in the summer of 1979, the second laundry room had already been closed. Respondent states that Maria "testified that in 1979 one of the laundry rooms was open for business." We have examined her testimony and we conclude that it is not clear whether Maria's statement, that one of the laundry room was open, referred to both 1978 and 1979 or only to 1978. Respondent states that Julian testified that the laundry room was open in 1979. We have examined his testimony and we conclude that he was referring generally to the 3-year period, 1977 through 1979, and not clearly to 1979. Respondent submitted an expert report by Robert Goldberg (hereinafter sometimes referred to as "Goldberg") in which Goldberg estimated that laundry rooms like those at the Apartments produce as rent an average of $ 4,500, net of expenses, per year. However, Goldberg *467 did not examine the laundry rooms in issue, did not know about fires which occurred in the laundry rooms, and did not take into account major maintenance problems or vandalism. Also, his report assumes that everyone in the Apartments (250 units) used the laundry equipment, even though one of the two laundry rooms was closed during all of the years before us. We conclude that while Goldberg's testimony and expert report show that laundry rooms generally generate income, Goldberg did not sufficiently take into account the facts in the instant case. We hold for petitioners on this issue. IX. Interest Deductions -- 1976 Through 1979
On answering brief, petitioners argue that they are entitled to deduct the full amounts claimed as interest payments petitioners made to Citizens Bank in 1976, 1977, 1978 and 1979. (Petitioners ignored this issue on opening brief.) Respondent argues that petitioners have not proven that they actually made any payments to Citizens Bank in 1976 or 1978, and that petitioners' evidence proves only $ 7,535.98 and $ 2,739.85 in mortgage interest payments to Citizens Bank for 1977 and 1979, respectively. Respondent further argues that petitioners *468 have not shown what part of any other 1979 payments, if any, is allocable to interest. We agree with respondent. For cash basis taxpayers, [24] section 163(a) [25] generally permits a deduction only for interest "paid" within the taxable year. Respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioners have the burden of showing that these determinations are wrong. Welch v. Helvering, supra; Rule 142(a). Because petitioners were on a cash basis, they are required to show actual payment of *469 interest on debts. Petitioners produced scant records to show actual payment of interest on the Citizens Bank mortgage. We are surprised and disappointed that the petitioners did not perform the usual, reliable, and ordinarily practical task of asking Citizens Bank for a summary of petitioners' payments for the years in issue. We are left with a grossly incomplete record on this issue. However, doing the best we can with the poor record before us ( Cohan v. Commissioner, 39 F.2d 540, 544 (CA2 1930)), we have concluded, and have found, that petitioners made $ 7,535.98 and $ 2,739.85 of deductible interest payments in 1977 and 1979, respectively. These are the amounts respondent conceded on brief. With respect to 1976 and 1978, we are not convinced that petitioners must have made any interest payments to Citizens Bank. Our conclusion is influenced by petitioners' failure to produce any records of any interest payments in 1976 or 1978 from Citizens Bank. Although the payment schedule for the mortgage might have called for interest payments to be made in 1976 and 1978, petitioners have not introduced any evidence that they actually made any such payments. As *470 to the other checks to Citizens Bank, petitioners have not shown us what the checks were for. In particular, petitioners have not shown us (1) that the checks were payments rather than deposits, and (2) even if the checks were payments (e.g., on Margaret's $ 50,000 note), whether they were payments of interest or payments of principal only. Petitioners' belated explanation on answering brief that "Quite clearly, what occurred was that the Helstoski's [sic] prepaid their interest and since the Helstoski's [sic] were cash basis taxpayers, their accountant deducted the interest the year it was paid" is unpersuasive and utterly unsupported by the record. Except for the $ 7,535.98 and $ 2,739.85 of interest payments in 1977 and 1979, respectively, we conclude that petitioners have failed to carry their burden of proof on this issue. We hold for respondent on this issue. X. Section 6653(a) -- Negligence, Etc. -- 1976 Through 1979
Respondent contends that petitioners are liable for an addition to tax under section 6653(a) for each of the years in issue. Petitioners maintain that they relied on their accountant, and so are not liable for the addition to tax for any of the *471 years. We agree with respondent. An addition to tax under section 6653(a)[26] *472 is imposed if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. Petitioners have the burden of proving error in respondent's determinations that this addition to tax should be imposed against them. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Under section 6001 [27] and paragraphs (a) and (e) of section 1.6001-1, Income Tax Regs., a taxpayer must keep such permanent books of account or records as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown on their tax return.
Robert, having been convicted of filing false income tax *473 returns, had more reason than most to be cautious in his tax positions and in maintaining records. The records that petitioners kept with respect to their alleged "repair and maintenance" expenses and the Citizens Bank mortgage were woefully inadequate to determine the amount of gross income and deductions to be reported on petitioners' income tax returns. Petitioners' failure to keep adequate records under these circumstances constitutes negligence. See Stovall v. Commissioner, 762 F.2d 891, 895 (CA11 1985), affg. a Memorandum Opinion of this Court; [28]Zivnuska v. Commissioner, 33 T.C. 226, 239-241 (1959). This negligence resulted in substantial omissions from income (even though the omissions were less than those determined by respondent). These omissions resulted in underpayments in each of the years in issue. In addition, petitioners' investments in the Hadley tax shelter in issue without any investigation (at least not during *474 or before the years in issue) as to the bona fides of the transactions was negligent. Petitioners invested in that shelter on the advice of Robert's brother-in-law, Curcio. Petitioners did not offer any evidence to show that Curcio was a tax professional, or that Curcio knew any more about the bona fides and tax effects of the Hadley shelter than did petitioners. Petitioners did not make the second required $ 7,500 payment with regard to the Hadley shelter. Despite the fact that petitioners acknowledge that they were not partners under the terms of the partnership agreement, and acknowledge that they did not receive a Form K-1 from Hadley and paid only $ 7,500 to Hadley, petitioners deducted $ 13,905 as their claimed share of partnership depreciation on their tax returns. No later than November 1980, petitioners and Curcio had doubts about the economic viability of the Hadley shelter. Petitioners have not shown that they were given detailed assurances by the promoter about the economic viability of the Hadley shelter; in fact, McCarthy failed to provide petitioners and Curcio with such assurances even though requested. The factual setting of the recent opinion of the Court of *475 Appeals for the Fifth Circuit in Heasley v. Commissioner , 902 F.2d 380, 383-384 (CA5 1990), revg. a Memorandum Opinion of this Court, [29] is significantly different from that in the instant case. In the instant case, respondent's determination as to the negligence, etc., additions to tax is amply supported by petitioners' inadequate business record-keeping and petitioners' deduction of pass-through losses of a partnership in which petitioners were not partners and as to which petitioners had not received a Form K-1. Thus, the instant case is not an appropriate vehicle for us to reexamine the analysis used by the Court of Appeals in Heasley. Cf. Groetzinger v. Commissioner, 82 T.C. 793, 796 (1984), affd. 771 F.2d 269 (CA7 1985), affd. 480 U.S. 23 (1987); Lawrence v. Commissioner, 27 T.C. 713 (1957), revd. on other grounds 258 F.2d 562 (CA9 1958). We conclude from the foregoing *476 that petitioners have an underpayment for each of the years before the Court and that some part of each underpayment is due to negligence. Petitioners urge that Robert's actions were reasonable because Robert hired Freilich to prepare their tax returns and to "manage their financial affairs", and because Robert was inexperienced in bookkeeping and accounting. Petitioners contend that they supplied the requisite facts to Freilich for him to follow a proper course of action. They state that, "Since the returns were filed, the petitioner [sic] quite naturally assumed that the proper course had been followed." As a general rule, the duty of filing an accurate tax return cannot be averted by shifting the responsibility to an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). Nothing in the instant case suggests that any exception should be made on the basis of the record herein. In any event, petitioners did not present Freilich as a witness (see Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (CA10 1947)) and we have no clear evidence as to what information they provided to Freilich *477 (see Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972)). We believe it especially unlikely that Freilich would have advised petitioners to claim depreciation deductions from a partnership (Hadley) in which they were not partners and from which they had not received a Form K-1. We hold for respondent on this issue. XI. Section 6621(c) -- Increased Rate of Interest -- 1978 and 1979
Respondent contends that the portions of petitioners' underpayments attributable to the book shelters and the lithography shelter are substantial underpayments attributable to tax motivated transactions, because: (1) petitioners did not engage in the shelter activities for profit; (2) the claimed deductions were based on valuation overstatements; and (3) petitioners were not "at risk" to the extent of the losses claimed for the tax shelters. As a result, respondent maintains, petitioners are liable for increased interest under section 6621(c). On brief, petitioners fail to argue the section 6621(c) issue. Indeed, their contentions on both of the shelter issues (issues II and III, supra) implicitly concede that they erred on their tax returns. We treat this as, in effect, *478 a concession of this issue by petitioners. See subparagraphs (4) and (5) of Rule 151(e); Foil v. Commissioner, 92 T.C. at 409; Money v. Commissioner, 89 T.C. at 48. We hold for respondent on this issue. To take account of the foregoing, and the parties' concessions, Decision will be entered under Rule 155. Footnotes
1. The instant case had been consolidated for trial, briefs, and opinion with the dockets for three corporations. After the briefs were filed, all of the corporate dockets were settled, the cases were severed, and decisions were entered in the corporate dockets. Thus, the corporations are no longer parties to these proceedings. Compare DeLucia v. Commissioner, 87 T.C. 804↩ (1986) (party remains a party until decision is entered even though all issues as to that party's deficiency have been resolved).
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue; references to section 6621↩ are to that section of the Internal Revenue Codes of 1954 and 1986 as in effect for periods after December 31, 1984.
3. Respondent's amendment to answer refers to section 6621(d). This provision was redesignated as section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. For simplicity, we will hereinafter refer to this section as section 6621(c)↩.
4. In his amendment to answer, respondent asserts that the laundry room concession produced $ 6,000 taxable income each year, that $ 2,400 each year was income to the corporations and "is then deemed to have been remitted back to Mr. Helstoski as a constructive dividend. The remaining $ 3,600 is taxable earned income to Robert Helstoski." As the amendment to answer notes, petitioners reported income from the laundry room concession in amounts ranging up to $ 2,000. Thus, the additional income amounts to $ 4,000 for 1976, $ 4,800 for 1977, $ 5,400 for 1978, and $ 6,000 for 1979. The amendment to answer does not explain how the additional income ($ 3,600 of which is "taxable earned income" and so presumably is eligible for the "maxitax", sec. 1348) could have resulted in the $ 4,200 additional deficiency each year that respondent claims in his amendment to answer.↩
*. The expert's "best estimate", with a range of $ 5,800 to $ 11,600.↩
5. We have dealt with Robin Moore tax shelters in several opinions. See, e.g., Dean v. Commissioner, 83 T.C. 56 (1984); Fuchs v. Commissioner, 83 T.C. 79 (1984); and Weimer v. Commissioner, T.C. Memo. 1987-390↩.
6. See Curcio v. Commissioner, T.C. Memo. 1982-609↩.
7. The parties have stipulated that Robert was imprisoned in Eglin from June 2, 1977, onward. Margaret testified that Robert was initially imprisoned in New York City and then, after almost 1 month, he was transferred to Eglin. The expenditures in dispute in this issue are stipulated to have been first incurred on June 29, 1977. Accordingly, we have concluded that the Eglin portion of Robert's imprisonment did not begin until well after the June 2, 1977, stipulated date.↩
8. The parties stipulate that all six of these checks were made out to Robert. The parties' stipulated summary sheet shows four of these checks made out to Margaret and the remaining two to Robert. However, all six of the checks stipulated as exhibits were made out to Margaret and endorsed by margaret, which is consistent with petitioners' undispited testimony as to the manner in which they dealt with the snow removal problem during the winter of Robert's imprisonment. Our finding is in accordance with the checks to the extent they disagree with the parties's stipulation. See Rule 91(e).
Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
9. The parties' stipulation states that the note is "dated April 9, 1976" and is "from Robert and Margaret Helstoski". Our findings are in accordance with the stipulated exhibit, rather than the stipulation's description of the exhibit.↩
10. Sec. 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $ 100. * * * [The subsequent amendments of this provision (by sec. 203(b) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 422) and by sec. 711(c)(2)(A)(i) of the Tax Reform Act of 1984 (Pub. L. 98-369, 98 Stat. 494, 943)) do not apply to the instant case.]↩
11. See 15 Mertens, Law of Federal Income Taxation, sec. 59.08, p. 26 (1989). A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, and intelligence, and having familiarity with the property and the valuation problem involved. It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based. The facts must corroborate the opinion, or the opinion will be discounted. [Fn. refs. omitted.]↩
12. Robert's approach puts us in mind of a "Snuffy Smith" cartoon. In the first panel, Ma (Elviney) says "After our ol' barn burnt down all th' folks in Hootin' Holler got together an' -- built it back just th' way it was." In the second panel, Ma looks at the ramshackle rebuilt barn and says "I wish they had built it back just th' way it wasn't↩! " The cost-of-repair method deals with the cost of putting the property "back just the way it was" before the casualty, not "just the way it wasn't".
13. The parties stipulate that $ 80,000 of petitioners' claimed $ 100,000 basis in the Robin Moore books "was based upon nonrecourse or contingent notes, which should not have been included in basis for depreciation calculations or any other purpose."↩
14. The parties' stipulations include the following with regard to this issue: Petitioners contend that their entire cash investment is deductible in 1978 as an I.R.C. section 165 loss. In the alternative, petitioners contend that their cash investment may be deducted as depreciation over 1978 and 1979. On brief, petitioners fail to argue the depreciation and loss issues with respect to the book shelters (other than arguing that the Policy Statement requires respondent to allow petitioners to deduct their cash investment). Except with regard to the effect of the Policy Statement, we treat this as, in effect, a concession of this issue by petitioners. See subparagraphs (4) and (5) of Rule 151(e); Foil v. Commissioner, 92 T.C. 376, 409 (1989), on appeal (CA5, May 30, 1989); Money v. Commissioner, 89 T.C. 46, 48↩ (1987).
15. Petitioners' opening brief quotes IRS Policy Statement P-4-64 (Approved 823-82), in relevant part, as follows: "Administrative Disposition of Certain Tax Shelter Program Cases. In an effort to administratively dispose of certain Tax Shelter Program cases at the lowest possible level, district Examination functions will be allowed to offer out-of-pocket expenses (cash investment) as a deduction in the initial year of the investment. Circumstances of Offer. Generally, the administrative offer of out-of-pocket expenses will be made only in those cases where the initial investment in the tax shelter was made in 1980 and prior taxable years. Closing agreements will be secured by the District Director where the taxpayer accepts the administrative offer. The administrative offer will not apply to those tax shelter cases which are designated as litigating vehicles and to criminal investigation cases * * *."↩
16. The parties' stipulations include the following with regard to this issue: Petitioners contend that Mr. Curcio purchased a full interest in Hadley Art Associates. Petitioners further contend that one half of this interest was purchased as nominee or agent for petitioner Robert Helstoski. On answering brief, petitioners concede that they never received an interest in Hadley. Petitioners do not claim, on either opening brief or answering brief, entitlement of any distributive share of Hadley's asserted loss or investment credit. Except with regard to petitioners' theft loss claim, we treat this as, in effect, a concession of this issue by petitioners. See n. 14, supra↩.
17. SEC. 165. LOSSES. * * * (e) Theft Losses. -- For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
18. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- * * * (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *↩
19. T.C. Memo. 1978-434↩.
20. In holding for respondent on this issue, we do not mean to suggest that Margaret acted inappropriately in making the trips, or in taking the children along, or in arranging for others to visit Robert. On the contrary, she fought hard (and, so far as we can tell, successfully) for her family. The strain, both physical and emotional, was great. We praise her determination, wisdom, and stamina. Nevertheless, since we conclude that the travel was primarily personal, the expenses of the travel are to be paid out of after-tax funds. See Welch v. Helvering, 290 U.S. 111, 115-116↩ (1933).
*. The stipulation and the exhibit show a higher amount of repair and maintenance checks for 1977 than does the notice of deficiency. Respondent concedes all but the $ 6,346 determined in the notice of deficiency.↩
21. Of the 22 counts of which Robert was convicted, 5 counts related to petitioners' tax returns and the remaining 17 counts related to the Corporations' tax returns.↩
22. In his amendment to answer, respondent states that "petitioner Robert Helstoski received at least $ 6,000 per year in taxable income from the operation of the laundry facilities." On brief, respondent states first that "It is respondent's position that as much as $ 6,000 in laundry income was received for each of the years in questions [sic] except 1979, when the laundry room eventually closed and a lesser amount was received." Later, on brief, respondent sums up as follows: "respondent has met its [sic] burden of proof in showing that the actual gross receipts were somewhere close to $ 6,000 per year." It is not clear whether respondent's different formulations ("at least $ 6,000 per year in taxable income"; "as much as $ 6,000 in laundry income * * * for each of the years * * * except 1979, when * * * a lesser amount was received"; and "gross receipts * * * somewhere close to $ 6,000 per year") are intended merely as "elegant variations". See R. Dickerson, The Interpretation and Application of Statutes 224 (1975), quoted in Zuanich v. Commissioner, 77 T.C. 428, 443 n. 26 (1981). The different formulations have made our task of stating respondent's position as like "trying to nail jelly to the wall." Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 513 F. Supp. 1100, 1207 (E.D. Pa. 1981), affd. in part and revd. in part sub nom. In Re Japanese Electronic Products, 723 F.2d 238 (CA3 1983), revd. sub nom. Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574 (1986), dist. ct. affd. on remand sub nom. In Re Japanese Electronics Products Antitrust Lit., 807 F.2d 44↩ (CA3 1986).
23. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle [i.e., subtitle A, relating to income taxes], gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (2) Gross income derived from business * * *↩
24. Both sides state on brief that petitioners are cash basis taxpayers; neither side has presented evidence to the contrary. We conclude that petitioners were on the cash basis for the years in issue. See Rubnitz v. Commissioner, 67 T.C. 621, 627↩ n. 7 (1977).
25. SEC. 163. INTEREST. (a) General Rule. -- There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
26. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendments of this provision (by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 Stat. 229, 253; by sec. 722(b)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 342-343; by sec. 1503 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2742; by sec. 1015(b)(2)(A) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3569; and by sec. 7721(c)(1) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399) do not affect the instant case. As a result of the 1989 Act, this material, as revised, appears in sec. 6662.] ↩
27. SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS. Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. Whenever in the judgment of the Secretary it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax under this title. * * * [This text takes into account amendments made by sec. 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, and by sec. 501(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2878. The amendments made by sec. 314(d) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 605, do not affect the instant case.]↩
28. T.C. Memo. 1983-450↩.
29. T.C. Memo. 1988-408↩.